**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

**RACHEL HARRIS, GUARDIAN OF**
**STEVEN JESSIE HARRIS**                                        **PLAINTIFF**

**V.**                                                    **NO. 1:18CV167 M-P**

**CLAY COUNTY, MISSISSIPPI et al**                                **DEFENDANTS**

## <u>ORDER</u>

This cause comes before the court on the motion of defendants to dismiss, pursuant to
Fed. R. Civ. P. 12.  Plaintiff Steven Jessie Harris (through his guardian Rachel Harris) has
responded in opposition to the motion, and the court, having considered the memoranda and
submissions of the parties, is prepared to rule.

This is a § 1983 action which presents difficult issues arising from the intersection of
concerns regarding public safety and the protection of the constitutional rights of a (former)
criminal defendant.  The former defendant in question is plaintiff Steven Harris, who, after being
indicted for murder and other serious offenses in 2005, spent almost eleven years in jail in spite
of being found incompetent to stand trial based on a diagnosis of schizophrenia.  At this juncture,
no discovery has been performed in the case, and this court is left largely with plaintiff's version
of the facts.  This is at least partly because, under Rule 12 standards, none of the defendants have
been able to introduce their version of the facts as developed in discovery.

In his brief, plaintiff describes the facts surrounding this case as follows:

On or about October 8, 2005, Harris was arrested and held in custody at the Clay County
Jail, for allegedly committing several criminal acts. An order for a competency evaluation
was entered on July 20, 2006, nine months after Harris was taken into custody.  In

violation of the July 20, 2006 order for an immediate competency evaluation, Harris was transferred to Whitfield Hospital one year after the original competency evaluation order.

The first Forensic Competency Summary Report was prepared and filed September 13, 2007. Dr. McMichael and Dr. Macvaugh, Plaintiff Steven's treating physicians at Whitfield Hospital determined that Plaintiff Steven suffered from Schizophrenia, lacking the ability to consult with his attorney, prepare a defense and understand the nature and object of legal proceedings against him. The medical staff also determined Plaintiff Steven lacked the ability to waive or assert his constitutional rights.

A fourth and final Forensic Competency Summary Report was prepared and filed September 8, 2008 after one year of inpatient treatment at Whitfield Hospital, providing the opinion that "there is no substantial probability" that Harris can be restored to competence to proceed legally in the foreseeable future.

Although a competency hearing was initially scheduled for October 14, 2008, counselors continuously agreed to continuances until Judge Howard set the competency hearing for October 12, 2010, two years after Plaintiff was deemed incompetent by mental examination. Plaintiff Steven remained in custody of the Clay County Sheriff during the two years despite the psychiatrist recommendations for long-term treatment.

As a result of the competency hearing, Judge Howard entered an order for District Attorney Forrest Allgood ("Allgood") to pursue Civil Commitment proceedings and ordered Harris to remain in custody until determination of civil commitment proceedings.

On October 12th, 2010, the Circuit Court of Clay County ordered that civil commitment proceedings be commenced against Harris. However, Special Master Thomas Storey signed an order October 20, 2010 finding that the Chancery Court lacked jurisdiction to hear this cause pursuant to Miss. Code Ann. §41-21-63 since Plaintiff Steven had pending criminal charges. Said order attempted to transfer jurisdiction of the case back [to] the Circuit Court of Clay County.

Further, eight days after the competency hearing, Judge Howard entered an order to remove the case from the active docket and deemed that Harris was "not competent to stand trial and ordered civil commitment proceedings to comply with Mississippi Code Annotated § 41-21-63 (1972)."

Upon Plaintiff's return to the Clay County Circuit Court, Allgood intentionally refused to release Plaintiff, despite the fact that the civil commitment proceeding had been dismissed for a lack of jurisdiction and he had been deemed incompetent to stand trial.

On or about October 5, 2012, nearly 2 YEARS following the Competency Order, Defendants Allgood, who along with Defendants Eddie Scott and Laddie Huffman ("Sheriffs"), Tanya West and Pearson Liddell were all unequivocally aware that Harris still remained … unlawfully detained following the termination of the civil commitment

proceeding, filed a Motion for Mental Re-Evaluation and Treatment. (Dkt No. 90-4 Ex. E pg. 17).

Furthermore, as evidenced by the Motion for Mental Re-Evaluation and Treatment, the Defendants and each of them conspired to have Harris's competency re-evaluated in order for him to stand trial, by way of the involuntary administration of anti-psychotic drugs and chemical restraints and forced unpaid labor on an incompetent person.

With assistance of new counsel, Harris filed a motion to dismiss for lack of speedy trial on August 10th, 2016 in the Circuit Court of Clay County on the grounds that the aforementioned Court violated his constitutional rights by continuing to imprison Plaintiff, a legally incompetent person and unconvicted person under purported color of law.  Harris was wrongfully imprisoned for approximately eleven years and released on August 15, 2017.

[Plaintiffs' brief at 1-3]

In summarizing the harm he has suffered, Harris argues that:

Though Harris has finally obtained his freedom, he will never regain the lost decade of his life, a decade stolen from him by the Defendants. Because he was unfit to stand trial at the time of his arrest, Defendants robbed Harris of 11 years of his adult life.

[Harris's response to West motion to dismiss at 4].  While this court is quite concerned about the procedural history of this case as described in plaintiff's brief, it is also worth noting that while he rather blandly asserts that he was accused of committing "several criminal acts" in this case, these acts included murder, aggravated assault on a law enforcement officer and kidnapping.  [Indictment at 2].  Plaintiff has not been declared factually innocent of these charges, and that being the case, it is open to question whether his flat assertion that he was "robbed . . .of 11 years of his adult life" will prove to be an oversimplification, or even incorrect. Indeed, the fact that Harris was accused of such serious crimes make it seem likely to this court that concerns regarding public safety, rather than a conscious decision to violate his constitutional rights, may have motivated defendants' actions in this case.

Still, the law is clear that mentally ill criminal defendants have certain rights under the U.S. Constitution, and, given the rather jarring procedural history of this case, this court can

discern real concerns as to whether plaintiff was afforded those rights in this case. In his brief, plaintiff describes the relevant constitutional law in this context as follows:

> A defendant in a criminal case who has not yet been convicted of the charge has a liberty interest in being free of confinement, unless there has been a determination of probable cause and pretrial detention is necessary to ensure the presence of the defendant for trial or the safety of the community. *United States v. Salerno*, 481 U.S. 739, 746-52 (1987); *Bell v. Wolfish*, 441 U.S. 520, 534 (1979); see also *Gerstein v. Pugh*, 420 U.S. 103 (1975). "[T]he criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). . . .When the prosecution of the criminal case cannot proceed because the defendant is incompetent to stand trial, the defendant may not be detained on account of the criminal charge more than a reasonable period of time to determine whether there is a substantial probability that the defendant will become competent in the foreseeable future. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). If the defendant is not restorable – i.e., not likely to become competent within the foreseeable future – the government must either release the
> defendant or institute civil commitment proceedings. *Id*. Even if it is foreseeable that the defendant will become competent, the continued commitment of the defendant "must be justified by progress toward that goal."

[Plaintiff's brief at 6].

That brings this court to the fact that, in their various motions to dismiss, defendants rely heavily upon legal arguments which generally fail to address the basic issue of whether plaintiff's constitutional rights were, in fact, violated in this case, and, if so, what each defendant's role (or lack thereof) in those violations might have been. This fact makes this court quite reluctant to resolve this case at this early juncture, particularly since the Fifth Circuit has previously expressed concerns regarding Mississippi counties' failure to comply with their obligation to grant criminal defendants speedy trials. For example, in 2017, the Fifth Circuit reversed a grant of summary judgment in a case in which a criminal defendant in Choctaw County waited for 96 days to be brought before a judge and was effectively denied bail. *Jauch v. Choctaw Cty.,* 874 F.3d 425, 427 (5th Cir. 2017). While there are many factual differences between this case and *Jauch*, this court believes that the same Fifth Circuit which found serious constitutional violations arising from a 96-day detainment might harbor grave concerns

4

regarding the almost eleven years which Harris spent in jail without having been convicted of anything.

From reading plaintiff's description of events, it appears that a crucial moment in this case may have taken place in October, 2010, when, by his description, the chancery court concluded that it did not have jurisdiction to try the civil commitment proceeding which, plaintiff contends, he was constitutionally due. Once again, plaintiff writes in his brief that:

> On October 12th, 2010, the Circuit Court of Clay County ordered that civil commitment proceedings be commenced against Harris. However, Special Master Thomas Storey signed an order October 20, 2010 finding that the Chancery Court lacked jurisdiction to hear this cause pursuant to Miss. Code Ann. §41-21-63 since Plaintiff Steven had pending criminal charges. Said order attempted to transfer jurisdiction of the case back [to] the Circuit Court of Clay County.
> Further, eight days after the competency hearing, Judge Howard entered an order to remove the case from the active docket and deemed that Harris was "not competent to stand trial and ordered civil commitment proceedings to comply with Mississippi Code Annotated § 41-21-63 (1972)."

[Id.] In his brief, plaintiff argues that "with the Chancery Court rejecting jurisdiction over Harris' civil commitment proceeding pursuant to an order dated October 20, 2010, upon Harris' return to the Clay County Circuit Court, Harris should have been immediately released at that moment, but most certainly no later than 4 months following entry of the Competency Order." [Id. at 8].

It thus appears that attempts were, in fact, made in October 2010 to give plaintiff the civil commitment proceedings which he claims he was due but that these efforts were doomed by the chancery court's refusal to accept jurisdiction over those proceedings. It is unclear to this court how this state of events came to pass, namely that there was (apparently) no Mississippi court willing to accept jurisdiction over the civil commitment proceedings which, federal law suggests, were due to Harris. Assuming that this court's understanding of this situation is correct, then it is unclear whether the chancery court's refusal represents a correct application of Mississippi law

and whether defendants had the option of appealing that refusal to the Mississippi Supreme Court. Clearly, it would present a difficult situation, both in this case and others, if Mississippi law does, in fact, preclude the civil commitment proceedings which federal law instructs are necessary.

The court trusts that the parties will further clarify the facts in this regard in subsequent briefing, but, as it stands now, it has serious concerns regarding plaintiff's description of the steps which, he contends, defendants took after the chancery court's refusal to accept jurisdiction over the civil commitment proceedings. In particular, this court has concerns regarding plaintiffs' allegation that:

> Furthermore, as evidenced by the Motion for Mental Re-Evaluation and Treatment, the Defendants and each of them conspired to have Harris's competency re-evaluated in order for him to stand trial, by way of the involuntary administration of anti-psychotic drugs and chemical restraints and forced unpaid labor on an incompetent person.

[*Id.*]. It is unclear to this court whether, upon receiving the rebuff from the chancery court, it was among defendants' legal options to administer their own medical treatment in an (apparently unsuccessful) attempt to restore him to sanity. Once again, the facts of this case have not been sufficiently developed for this court to even have a clear idea if defendants did, in fact, undertake this course of action. At least on the surface, however, this alleged course of action has something of an *ad hoc* appearance to it which gives this court concerns regarding its legality. These concerns are only heightened by the fact that Harris was eventually released from custody in August 2017, which was almost seven years after the chancery court had rejected jurisdiction over the civil commitment proceedings and almost eleven years after plaintiff was first criminally charged.

It should be apparent from the above discussion that this court believes that the defendants in this case have a good deal to answer for, and it does not believe that those answers

have been provided in the motions to dismiss. It may well prove to be the case that, after discovery, defendants will be able to present their own version of the facts and adequately explain how it took seven years for Harris to be released after the chancery court's refusal to accept jurisdiction over the civil commitment proceedings. This court suspects that the answer to this question may have a great deal to do with concerns over public safety, and, if so, this would certainly be understandable on a human level. At the same time, this court is presently charged with applying federal law, and that law generally does not excuse the constitutional rights of a criminal defendant being violated, even when those violations are based upon a well-intentioned desire to protect the public.

While this court thus regards plaintiff's claims as raising serious issues, it does acknowledge that his Second Amended Complaint often leaves a great deal to be desired, particularly in the manner in which it makes blanket allegations against "defendants" without taking care to specify exactly which defendant is alleged to have committed which unlawful act. For example, plaintiff alleges in his False Imprisonment claim that:

> 74. As described more fully above, Clay County, Former Sheriff Laddie Huffman, Sheriff Eddie Scott, Former District Attorney Forrest Allgood, Former Director of Mississippi Department of Mental Health Edwin C. Legrand, III, and Tanya West, RN and John Does 1-5, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, caused Plaintiff Steven to be wrongfully imprisoned in violation of his constitutional rights.

[Second am. Complaint at 19]. This is, in the court's view, sloppy and careless pleading, since it makes blanket allegations against all defendants without factually supporting them. For example, the complaint fails to adequately allege how defendant Tanya West, a registered nurse, might have committed false imprisonment, given her limited authority over him. This is merely one example of an overbroad and/or factually unsupported allegation in the complaint, and these allegations serve to detract from the complaint as a whole. In his brief, plaintiff appears to

tacitly acknowledge (or at least fails to dispute) the deficiencies in his complaint and requests leave to amend, writing that:

> In the event that there are deficiencies in the Second Amended Complaint that can be cured, Plaintiff requests that he be granted leave to amend in order to cure those deficiencies.

[Plaintiffs' brief at 19].

Given the serious nature of the allegations raised in this case, this court will give plaintiff one more opportunity to file a complaint which clearly sets forth plausible allegations against each defendant in this case. After (or, if necessary, before) that Third Amended Complaint has been filed, the Magistrate Judge is requested to set a period of discovery, and defendants may then file motions for summary judgment in this case. Considering defendants' limited factual response to those allegations to date, this court concludes that Rule 56 summary judgment, and not Rule 12 dismissal, provides the best legal format in which to consider the validity of most of plaintiff's claims.

Nevertheless, this court has determined that there are a limited number of issues raised in the motions to dismiss which can be addressed based on the briefing and pleading currently before it. This court will also take this opportunity to make some initial observations regarding some of the more difficult legal issues raised in the briefing, in order to (hopefully) streamline the issues and assist the parties in briefing them on summary judgment.

**Forrest Allgood**

This court considers first the motion to dismiss filed by former District Attorney Forrest Allgood, [1] in his official and individual capacities. The claims against Allgood are somewhat unique in that, based on his status as a district attorney, he enjoys certain defenses which are unavailable to other defendants and which are appropriately addressed at the Rule 12 dismissal stage of these proceedings. As the individual who prosecuted Harris, Allgood may have had the greatest impact of any of the defendants upon the manner in which the criminal case against him was prosecuted, but, at the same time, he enjoys a greater degree of legal protections from civil lawsuits than any of the other defendants here. Indeed, constitutional claims asserted under § 1983 are the manner in which allegations such as the ones raised by Harris would typically be asserted, but, it is well established that, as a Mississippi district attorney, Allgood may claim sovereign immunity for § 1983 claims for monetary damages asserted against him in his official capacity.

In his complaint, Harris asserts § 1983 claims against Allgood in his official capacity, alleging denial of access to the courts, malicious prosecution, false imprisonment, and lack of due process for involuntary administration of medication, but these claims each fall squarely under the scope of Eleventh Amendment immunity. It is "well established that even though a State is not named a party to the action, the suit may nonetheless be barred by the Eleventh Amendment." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). Suits against state agencies or officials which ultimately seek monetary recovery from state funds are barred by the Eleventh Amendment. *Id.* Thus, state officials are entitled to Eleventh Amendment immunity for claims asserted against them in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

---

[1] In his brief, plaintiff asserts that he "withdraws" his claims against Edwin C. LeGrand, III, the former Executive Director of the Mississippi Department of Mental Health, and this court will therefore grant the motion to dismiss Legrand as a defendant in this case.

The reasoning behind this well-established principle is that "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents." *Id.* (*quoting Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Moreover, states and their arms and officials are not "persons" who can be held liable under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989).

Mississippi's district attorneys are primarily state-funded, and their authority extends to statewide concerns. *Chrissy F. by Medley v. Miss. Dep't of Pub. Welfare,* 925 F.2d 844, 849 (5th Cir. 1991). As a result, the Fifth Circuit has held that Mississippi district attorneys are state officials entitled to Eleventh Amendment immunity. *Id.*; *Hudson v. City of New Orleans*, 174 F.3d 677, 682 (5th Cir. 1999); *Brooks v. George Cty., Miss.,* 84 F.3d 157, 168 (5th Cir. 1996). *See also Brown v. Harrison County Circuit Court*, 1:05-cv-289-LG-RHW, 2007 WL 1306422, *2 (S.D. Miss. Apr. 30, 2007) ("Additionally, the District Attorney's Office does not enjoy a separate legal existence under Mississippi state law and, therefore, the Plaintiff cannot pursue a cause of action against it."). In light of the foregoing, it seems clear that the § 1983 claims asserted against Allgood in his official capacity are due to be dismissed on the basis of Eleventh Amendment immunity. Indeed, this court does not regard plaintiff's brief as offering serious opposition to Allgood's Eleventh Amendment Immunity arguments, and this court concludes that discovery would be of no potential assistance to him in asserting these complaints. Plaintiff's § 1983 claims for damages against Allgood in his official capacity will therefore be dismissed as barred by Eleventh Amendment immunity.

While Harris' § 1983 damages claims against Allgood in his official capacity are thus subject to Eleventh Amendment immunity, plaintiff also asserts what strikes this court as being a rather novel claim against him under section II of the Americans With Disabilities Act (ADA).

In his brief, Allgood does not assert that Eleventh Amendment Immunity applies to this ADA claim, presumably agreeing with plaintiffs that the Supreme Court's decision in *Tennessee v. Lane*, 541 U.S. 509 (2004) opens the door for state liability in this context.[2] While not asserting an Eleventh Amendment immunity defense in this context, Allgood does argue that any individual capacity claims asserted against him under the ADA are due to be dismissed, since the ADA does not provide for individual liability. *See, e.g. Roman-Oliveras v. Elec. Power Auth*, 655 F.3d 43, 52 (1st Cir. 2011); *Parker v. Benteler Steel Tube Mfg. Corp.,* 2018 WL 3685383, at *3 (W.D. La. July 18, 2018) (concluding that the Fifth Circuit would follow the consensus view of the other circuits that no individual liability exists under the ADA.). This court agrees, and plaintiffs' individual-capacity claims against Allgood (as well as against any other individual defendants) under the ADA will therefore be dismissed.

With regard to the ADA claims asserted against him in his official capacity, Allgood maintains that plaintiff fails to properly allege a violation of the Act on his part. This claim presents a closer issue. To establish a *prima facie* case under the ADA or the Rehabilitation Act, a plaintiff must show "(1) that she is a 'qualified individual' with a disability; (2) that the

---

[2] In his complaint, plaintiff clearly anticipated the issue of whether Eleventh Amendment immunity bars his ADA claims, writing that:

> In *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court held a state's Eleventh Amendment immunity from suits involving monetary damages brought by citizens in federal court could be abrogated by section 5. That holding was based upon Congress' constitutional authority to provide access to the courts under the Fourteenth Amendment's due process clause. 45. Title II of the ADA is the one under which a prisoner would file suit to address discrimination against a qualified individual with a disability by a public entity. Title II, as applied to discrimination against prisoners with disabilities, has been a congruent and proportional response to actual and threatened constitutional violations. The Supreme Court's holding in *Tennessee v. Lane* that Title II is unquestionably valid, "as it applies to the class of cases implicating the accessibility of judicial services," was profound. It demonstrated that courts must be accessible for prisoners with disabilities.

defendants are subject to one of the Acts; and (3) that she was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability.'" *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.,* 804 F.3d 178, 187 (2nd Cir. 2015) (*quoting Powell v. Nat'l Bd. of Med. Examiners,* 364 F.3d 79, 85 (2nd Cir. 2004)).

In the section of his complaint setting forth his ADA claims, plaintiff alleges that:

52. District Attorney Forrest Allgood and Sheriffs continuously held Plaintiff Steven in the Clay County Jail in contempt of a Circuit Court Order to initiate civil commitment proceedings that would have allowed Plaintiff Steven to receive long-term treatment at a state mental institution.
53. While a pre-trial detainee at the Clay County Jail, Plaintiff Steven was denied access to courts in violation of his Fourteenth Amendment rights. Further, while a pre-trial detainee at the Clay County Jail, Plaintiff Steven was forced to perform various tasks to the benefit of Clay County and Defendant Sheriffs, including janitorial tasks and meal service, in violation of his Thirteenth Amendment rights.
54. Plaintiff Steven had a right to refuse medication and did refuse oral medication. Plaintiff Steven was involuntarily given intramuscular injections by Defendant County and Defendant Tanya West, RN, that were used as a "chemical restraint" without affording Plaintiff Steven due process rights, such as rights available under Washington v. Harper, 494 U.S. 210 (1990).
55. Plaintiff Steven endured continuous and systematic deprivation of access to courts and denial of physician-recommended mental health treatment.
56. Such policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the direct and proximate cause of Plaintiff Steven's deprivation of rights secured by the United States Constitution under the Thirteenth and Fourteenth Amendment, as well as the ADA and Rehab Act, because of his mental disability.

[Second amended complaint at 16].

This court regards these as serious and troubling allegations, and it is worth emphasizing that Allgood's brief largely ignores the issue of whether constitutional violations occurred in this case. Nevertheless, § 1983, and not the ADA, is the vehicle which federal courts have traditionally used to address constitutional violations such as the ones alleged above, and § 1983 claims are clearly subject to Eleventh Amendment immunity. True enough, *Lane* makes it clear

that there may be overlap between violations of Title II of the ADA and the Fourteenth Amendment, and, where such overlap exists, Title II may serve to override Eleventh Amendment sovereign immunity which would otherwise exist. Nevertheless, it seems clear that utilizing the ADA as a means of recovering monetary damages against a prosecutor based upon the manner in which he criminally prosecuted a defendant would represent a very significant leak in what has heretofore been a largely watertight barrier of immunity enjoyed by Mississippi prosecutors.

While it thus seems clear that authorizing the use of the ADA as a means of imposing liability against prosecutors for prosecutorial decisions would represent a rather dramatic shift in the legal framework in this context, it does appear that Harris is able to offer a non-frivolous argument that the ADA applies in this case. Indeed, Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II thus protects the right of disabled individuals to enjoy the "services, programs, or activities of a public entity," and this court can discern a good faith argument that mental health treatment is one such "service."

In his brief, Allgood argues that "the gist of Harris's claim, whether amended or not, is that he was in need of mental health treatment and did not receive it while held in pre-trial custody in the Clay County jail." [Brief at 7] This appears to be correct. It is thus significant that the weight of federal authority seems to support defendant's position that failure to treat a disability may not constitute disability discrimination under the ADA. In *Doe v. Harris Cty., Texas,* for example, a Texas district court rejected allegations similar to those advanced by plaintiff here, writing that:

Asserting that she is a person with a mental disability as defined by the ADA and that Harris County is a public entity within the meaning of Tile II of the ADA, plaintiff alleges that Harris County discriminated against her because of her disability in violation of the ADA by treating her as a criminal defendant who did not require mental health treatment or medical care, denying her reasonable and appropriate standards of hygiene, denying her services and programs that would have accommodated her disability and were available to other inmates, and threatening her with felony prosecution for behavior that was symptomatic of her deteriorating mental health.

The court is not persuaded that these allegations state a claim under the ADA or § 504. Plaintiff's allegation that Harris County discriminated against her because of her disability by treating her as a criminal defendant who did not require mental health treatment, and by denying her services and programs that would have accommodated her disability are merely different ways of alleging that Harris County failed to provide her adequate mental health treatment.

2017 WL 4402590, at *29 (S.D. Tex. Sept. 29, 2017).

In his brief, Allgood notes that *Doe* is supported by substantial authority from a number of circuits:

"The ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo Cty., Ariz.,* 609 F.3d 1011, 1022 (9th Cir. 2010). Specifically, it does not require any particular medical treatment, including mental health treatment, for jail detainees. *See Kokinda v. Penn. Dep't of Corr.,* 663 Fed. Appx. 156, 159 (3rd Cir. 2016) ("the ADA prohibits disability-based discrimination, 'not inadequate treatment for the disability'") (*quoting Simmons*, 609 F.3d at 1022); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (in the absence of discrimination, the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners"); . . . *George v. La. Dep't of Pub. Safety & Corr.*, Civil Action No. 3:14-338-JWD-EWD, 2016 WL 3568109, *10 (M.D. La. Jun. 23, 2016) ("the ADA is not violated by a prison failing to attend to the medical needs of its disabled prisoners"); *Cheek v. Nueces Cty., Tex.,* Civil Action No. 2:13-CV-26, 2013 WL 4017132, *18 (S.D. Tex. Aug. 5, 2013) (dismissing ADA and Rehabilitation Act claims of county jail detainee found mentally incompetent to stand trial because the statutes do not require provision of "any particular treatment as a matter of preventing discrimination").

[Brief at 8].

For his part, Harris does have some authority in support of his contention that a failure to treat a disability may constitute disability discrimination under the ADA, most notably the 2015 Texas district court decision of *Borum v. Swisher Cty*., 2015 WL 327508, at *8 (N.D. Tex. Jan. 26, 2015). In *Borum*, the district court wrote, in denying a motion for summary judgment, that:

Viewing this evidence in the light most favorable to the Plaintiffs, a jury could find that Swisher County was responsible for providing food and medical care to Mr. Borum, yet denied Mr. Borum those services by feeding him nothing more than honey and orange juice for three days and by failing to call a doctor, hospital, or otherwise provide medical care for Mr. Borum when it was clear that he was experiencing severe symptoms of alcohol withdrawal and DTs. Defendant's partial Motion for Summary Judgment is denied as to Defendant's argument that Plaintiffs have failed to put forth evidence showing that Defendant excluded Mr. Borum from participation in, or otherwise denied Mr. Borum benefits, services, programs, or other activities for which Defendant was responsible.

*Borum v. Swisher Cty.,* 2015 WL 327508, at *7 (N.D. Tex. Jan. 26, 2015).

Significantly, the district court in *Borum* appeared to disagree with Allgood's view of the relevant standard for "intent" in this context, writing that:

Here, Defendant asserts that there is no evidence that Swisher County's actions were motivated by discriminatory animus or ill will. However, as this Court previously explained in its September 29, 2014 opinion denying Defendant's Motion to Dismiss, neither the Fifth Circuit nor any other circuit court requires a showing of animus or ill will in order to establish intentional discrimination under the ADA. A majority of circuits have held that intentional discrimination can be proved by showing that the defendant acted with deliberate indifference to the strong likelihood of a violation of the ADA or RA. *See, e.g., Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 275 (2d Cir. 2009); *A.G. v. Lower Merion Sch. Dist.*, 542 F. App'x 194, 198 (3d Cir. 2013); *Meagley*, 639 F.3d at 389; *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001); *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228–29 (10th Cir. 2009); *Liese v. Indian River Cnty. Hosp. Dist.,* 701 F.3d 334, 345 (11th Cir. 2012). Although the Fifth Circuit has explicitly declined to adopt this widely-accepted deliberate indifference standard for intentional discrimination under the ADA, it has also declined to establish a definition of intentional discrimination that would require a showing of animus or ill will. *See Delano–Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 575 (5th Cir. 2002); *Frame v. City of Arlington*, 657 F.3d 215, 231 n. 71 (5th Cir. 2011). Thus, Plaintiffs are not required to produce evidence that Defendant's actions were motivated by discriminatory animus or ill will in order to satisfy the third element of the prima facie case of disability discrimination.

*Borum*, 2015 WL 327508, at *7.  This analysis in *Borum* conflicts with defendant's position that plaintiff is required to demonstrate that he was denied access to mental health treatment "because

of discriminatory animus based on his alleged mental disabilities,"[3] and, as quoted above, the Fifth Circuit appears to have specifically declined to adopt a standard in this regard.

For its part, this court is not prepared to offer a definitive ruling on this difficult and unsettled issue of law at this juncture, since it concludes that its consideration thereof would benefit from additional discovery and briefing by the parties. Nevertheless, this court notes that, at this juncture, it is more inclined to agree with Allgood's arguments than those submitted by plaintiff. In so stating, this court emphasizes that there are two separate issues in this context, namely 1) whether *any* defendant could be held liable under the ADA for failing to treat the mental disability of a prisoner and 2) whether a prosecutor should face liability in this context. While the above federal authority suggests that the answer to the first question may well be "no," it strikes this court that plaintiff faces an even heavier burden in demonstrating that the ADA was intended to authorize liability against prosecutors in this context. That being the case, this court directs that, on summary judgment briefing, plaintiff represent to this court whether he has any actual federal authority authorizing the use of the ADA as a means of recovering monetary damages against his prosecutor for actions such as the ones he alleges Allgood committed in this case.

This court now turns to Allgood's argument that he is entitled to absolute prosecutorial immunity for the § 1983 allegations against him in his individual capacity. In his brief, Harris concedes that Allgood should be afforded absolute immunity for all of his actions prior to the chancery court's dismissal of the civil commitment proceeding on October 20, 2010, because Allgood "was serving a role as a state advocate during that stage of Harris' criminal

---

[3] [Reply brief at 4, *citing Brown v. Penn. Dept. of Corrections*, 290 Fed. Appx. 463, 467 (3rd Cir. 2008).]

proceedings." [Plaintiff's brief at 12]. Plaintiff maintains, however, that upon the circuit court's resumption of jurisdiction over the case, the criminal case against Harris was effectively terminated because he had been found incompetent to stand trial. Docket No. 98 at 12. As a result, Harris contends that Allgood is not entitled to prosecutorial immunity because he intentionally caused him to remain in custody instead of securing his release, which "was in no way directly related to the conduct of a trial." *Id.* at 13.

In rebutting these arguments in its reply brief, defendant asserts a number of specific facts which, he contends, support a finding that he was acting as a state prosecutor throughout this case:

> The circuit court was not notified when the chancery court dismissed Harris's civil commitment proceeding. See Exhibit 1 at 2. Allgood learned about the chancery court's dismissal when Harris's attorney contacted him on October 2, 2012, asking about the status of the civil commitment. See Exhibit 2, Motion for Mental Re-Evaluation and Treatment. Allgood then engaged in discussions with the Sheriff in preparation for filing documents with the chancery court to re-initiate the civil commitment process. Id. at 1. However, the Sheriff advised Allgood that Harris was regularly taking medication, interacted well with the other inmates and staff, and acted as the "floor man" for his area of the jail (responsible for distributing food trays and cleaning the area). Id. A nurse with the Clay County jail provided Allgood a letter indicating that she had observed significant improvement in Harris's behavior since beginning a new regimen of injections pursuant to order by a doctor. Id. at 3. Specifically, she observed that Harris was laughing, joking, and conversing with staff, lacked his previous behavioral problems, volunteered for extra duties, and enjoyed his work at the jail. Id. Based on this information, on October 8, 2012, Allgood filed a motion requesting that the circuit court place Harris's criminal case back on the active docket and order that Harris undergo a re-evaluation to determine his present competency to stand trial and his sanity at the time of the offense. Id. at 2.

[Reply brief at 6].

It is not clear to this court that these facts are within the proper scope of Rule 12 arguments,[4] but, even assuming for the sake of argument that they are, they were set forth in defendant's reply brief, as to which this court has no sur-rebuttal from plaintiff. While this court is inclined to agree with defendant that he was, in fact, acting as a state prosecutor throughout this case, it concludes that this issue is better addressed after the completion of discovery. In so stating, this court emphasizes that absolute prosecutorial immunity is considerably more limited in scope than, say, absolute judicial immunity. For example, the U.S. Supreme Court has rather strictly limited absolute prosecutorial immunity to core prosecutorial functions which are "intimately associated with the judicial phase of the criminal process," and it has not extended that immunity to "investigative" and other similar functions. *See, e.g. Buckley v. Fitzsimmons*, 509 U.S. 259, 262 (1993). Based on the limited facts available to this court at this juncture, this court is not prepared to definitively state whether or not Allred might have "crossed the line" into non-core prosecutorial functions in this case, such as through his role in medicating plaintiff to have him declared competent for trial. Thus, while this court may eventually agree with Allred that he enjoys absolute immunity as to all claims against him, it concludes that these issues would best be addressed on summary judgment, at which time this court will, presumably, have a much more complete understanding regarding the actions which he took in this case.

**Remaining defendants' motions to dismiss**

As noted previously, the remaining defendants' motions to dismiss do not implicate Eleventh Amendment jurisdictional concerns, and, after reviewing them, this court concludes

---

[4] Unless a Rule 12(b)(6) motion is converted to a summary judgment motion, the court cannot consider material outside the complaint. *See Powe v. Chicago*, 664 F.2d 639, 642 (7th Cir. 1981).

that they raise only one issue which is appropriately considered prior to any discovery having been performed in this case. That issue is an argument, raised by all defendants, that the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994) bars plaintiff's claims in this case. Typical of defendants' *Heck* arguments is defendant West's assertion that:

> Finally, Plaintiff's false imprisonment claim is barred by *Heck v. Humphrey*. Pursuant to *Heck*, a plaintiff who has been convicted of a crime, cannot recover damages for an alleged violation of his constitutional rights
>
>> [I]f the alleged violation arose from the same facts attendant to the charge for which he was convicted, unless he proves that his conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination or called into question by a federal court's issuance of a writ of habeas corpus.
>
> *Ballard v. Burton*, 444 F.3d 391, 396 (5th Cir. 2006)(citing Heck, 512 U.S. at 486-87). As such, when a plaintiff seeks to recover damages under Section 1983, courts must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence and, if it would, the suit must be dismissed unless the Plaintiff can demonstrate that the conviction or sentence has already been invalidated. Id. (emphasis added).

[West's brief at 11].

This is an accurate description of the *Heck* doctrine, and, for the purposes of this case, the key words quoted above are that "a plaintiff who has been convicted of a crime" generally cannot recover for claims relating to that crime unless that conviction is expunged on appeal or otherwise declared invalid. In this case, however, the central fact is that plaintiff has *not* been convicted of anything; indeed, he was never even afforded a trial. Defendants seek to gloss over this fact by pointing out that "the charges against Plaintiff were Nolle Prossed on August 15, 2017," and they attempt to direct this court's attention to the issue of whether that Nolle Prosse was a "favorable termination" of the proceedings within the meaning of *Heck*. In the context of *Heck*, however, the "favorable termination" requirement seeks to determine whether a criminal defendant who *has been convicted* of a crime has obtained a reversal or other such favorable termination of that conviction. It strikes this court that, by ignoring the fact that Harris has not

been convicted of anything, defendants are seeking to gloss over the central requirement for the application of the *Heck* doctrine.

The U.S. Supreme Court has made it clear that *Heck* does not apply in the absence of a criminal conviction, writing that "the *Heck* rule for deferred accrual is called into play only when there exists 'a conviction or sentence that has not been ... invalidated.'" *Wallace v. Kato*, 549 U.S. 384, 392-93, 127 S. Ct. 1091 (2007). In *Kato*, the Supreme Court rejected a defendant's attempt to apply *Heck* to a conviction which had not yet occurred when the complaint was filed, writing that:

> What petitioner seeks, in other words, is the adoption of a principle that goes well beyond *Heck*: that an action which would impugn an anticipated future conviction cannot be brought until that conviction occurs and is set aside. The impracticality of such a rule should be obvious. In an action for false arrest it would require the plaintiff (and if he brings suit promptly, the court) to speculate about whether a prosecution will be brought, whether it will result in conviction, and whether the pending civil action will impugn that verdict, all this at a time when it can hardly be known what evidence the prosecution has in its possession. And what if the plaintiff (or the court) guesses wrong, and the anticipated future conviction never occurs, because of acquittal or dismissal? Does that event (instead of the Heck-required setting aside of the extant conviction) trigger accrual of the cause of action? Or what if prosecution never occurs—what will the trigger be then? We are not disposed to embrace this bizarre extension of *Heck*.

*Kato*, 549 U.S. at 393.

The Supreme Court in *Kato* thus rejected the notion that *Heck* may serve to bar a claim by a plaintiff such as Harris who has not been convicted of anything, and this court will likewise reject this "bizarre extension of *Heck*." *Id.* at 393. In their briefing, defendants rely upon *Cooley v. City of Waynesboro*, 2017 WL 4156193, at *7 (S.D. Miss. Sept. 19, 2017), in which Judge Wingate wrote that "[t]he defendants ask this court to find that *Heck* applies and this case should be dismissed because Cooley has not obtained a 'favorable termination' of the underlying criminal charges which color this litigation." This court believes that, in writing that mere criminal "charges," and not an actual conviction, is sufficient to give rise to *Heck*'s bar, Judge

Wingate may have run afoul of the Supreme Court's holding in *Kato*. This court is obviously bound by U.S. Supreme Court precedent, and not decisions of other district courts, and it will accordingly heed the Supreme Court's admonition that *Heck* only applies when there is "a conviction or sentence that has not been invalidated." All parties agree that no such conviction exists in this case, and this court accordingly finds that *Heck* is inapplicable in this case.

Given the seriousness of the allegations in this case, and the scarcity of information in the record regarding exactly what actions were taken by each defendant, this court concludes that defendants' remaining arguments are best considered in the context of a summary judgment motion after the filing of a Third Amended Complaint and the completion of discovery. This court will leave it to the Magistrate Judge's discretion whether the Third Amended Complaint should precede or follow that period of discovery. This court emphasizes that, in seeking leave to file such a Third Amended Complaint, plaintiff has tacitly acknowledged the deficiencies in his current complaint, and he should not anticipate receiving yet another opportunity to clearly allege exactly which violations were committed by each defendant. Moreover, there are a number of arguments raised by defendants in their motions to dismiss which were not directly addressed by plaintiff in his response, and this court directs plaintiff to not include any such conceded claims in his Third Amended Complaint. This court would further advise plaintiff that, in the pleading context, less is often more, since overbroad "shotgun" complaints often serve to obscure the potentially valid claims by making carelessly broad allegations against "defendants."

As a final note, this court would observe that, to date, none of the defendants have offered a substantive explanation regarding how the eleven years which Harris spent awaiting trial can be reconciled with federal law. This may simply reflect the fact that, in the absence of discovery and given the applicable Rule 12 standards, defendants have been unable to cite

helpful facts in their favor on this issue.  If, however, this silence reflects the fact that defendants simply cannot justify their actions under federal law, then they would be well advised to consider settling this case.  Plaintiffs should have every incentive to seek a settlement as well, considering that, if this matter does eventually proceed to trial, jurors may be less than sympathetic to claims by an individual who is suspected of having committed, *inter alia*, murder and aggravated assault on a police officer.

It is therefore ordered that the motions to dismiss are granted as to the § 1983 claims asserted against Allgood in his official capacity, and as to ADA claims asserted against any defendant in his or her individual capacity.  This court will reserve ruling on the remaining arguments set forth in the motions to dismiss [75-1, 80-1, 84-1, 88-1, 115-1, 126-1] until after the completion of discovery, when they can be raised in summary judgment briefing.

This, the 25th day of March, 2020.


/s/ Michael P. Mills
U.S. DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI