IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

RACHEL HARRIS, GUARDIAN OF STEVEN
JESSIE HARRIS ON BEHALF OF STEVEN
JESSIE HARRIS                                                          PLAINTIFF

v.                                                          CASE No. 1:18-cv-167-MPM-RP

CLAY COUNTY, MISSISSIPPI et al.                                        DEFENDANTS


## ORDER

    This cause comes before the court on the motion of defendants Forrest Allgood, Eddie Scott, Laddie Huffman and Clay County, Mississippi for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Steven Jessie Harris has filed his own motion for partial summary judgment,[1] and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

    This is a § 1983 action which presents difficult issues arising from the intersection of concerns regarding public safety and the protection of the constitutional rights of a (former) criminal defendant. The former criminal defendant in question is plaintiff Steven Harris, who, after being indicted for murder and other serious offenses in 2005, spent almost eleven years in jail in spite of being found incompetent to stand trial based on a diagnosis of schizophrenia. These rather jarring procedural facts raise serious constitutional concerns in light of U.S. Supreme Court precedent, most notably *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). In *Jackson*, the Supreme Court held that a criminal defendant found incompetent to stand trial cannot be held more than the reasonable period of time necessary to determine whether there is a

---

[1] The plaintiff in this case is actually Harris' mother, acting as his representative, but this court will refer to him as the plaintiff for the sake of simplicity.

substantial probability that he will attain competency in the foreseeable future. *Id.* If it is determined that he will not regain competency, then the State must either institute civil proceedings applicable to the commitment of those not charged with a crime or release the defendant. *Id.*

Plaintiff argues, with considerable force, that *Jackson* was violated in this case, and, as part of the federal judiciary, it is this court's responsibility to enforce federal law. At the same time, the crimes for which plaintiff was indicted are so serious that this court cannot help but feel a certain degree of sympathy for the reluctance demonstrated by the defendants in this case to simply release him upon the public. In so stating, this court notes that Harris was indicted on 11 counts including the murder of his father, shooting three law enforcement officers, car-jacking two college students, stabbing another car-jacking victim, shooting into multiple occupied vehicles, and escaping the scene by car-jacking and kidnapping. [Dkt. #39-3 pp 2-8]. In the court's view, the nature of these alleged crimes, and of plaintiff's mental illness, is such that no responsible law enforcement official could help but feel grave trepidation over the prospect of releasing him to the public. At the same time, the law must, at the end of the day, be followed, and it is this basic dilemma which makes this case so extraordinarily difficult.

As noted above, Harris had a history of suffering from severe mental illness, including schizophrenia, and he was transferred to the Mississippi State Hospital at Whitfield for mental evaluation to determine his competency to stand trial and his mental state at the time of the charged offenses. [Order for Mental Evaluation and Treatment]. After three interim reports that had shown some improvement in his symptoms, plaintiff's treating doctors at Whitfield issued a Final Summary Report on September 8, 2008 in which they expressed their opinion that there was no substantial probability that he could be restored to competency in the foreseeable future.

2

[Ex. H to Allgood's motion for summary judgment]. In their report, the Whitfield doctors found that Harris remained at increased risk for future violence and needed long-term psychiatric treatment. [*Id* ]. As a result, they recommended transferring the case to chancery court for civil commitment proceedings if the circuit court found Harris to not be competent to proceed. [*Id.*].

After multiple orders of continuance, the circuit court conducted a competency hearing on October 12, 2010, after which it ordered the State of Mississippi to pursue civil commitment proceedings. On October 12, 2010, the same date as the competency hearing and order, Assistant District Attorney Lindsay Clemons did, in fact, file a Petition for an Order of Commitment in the Chancery Court of Clay County, Mississippi, as required by the circuit court and as recommended in Whitfield's Final Summary Report. [Doc. 168 at ¶ 33; Ex. C at 45]. On October 20, 2010, the circuit court entered an order removing Harris's criminal case from the active docket to allow the civil commitment proceeding to proceed in chancery court. [Ex. M, Order Removing Case from Active Docket].

It is at this point that this case took an unusual procedural turn. Rather than conducting the civil commitment proceedings that had been ordered by the circuit court, the chancery court dismissed, in an order dated October 20, 2010, Harris's civil commitment proceeding for lack of jurisdiction because there were criminal charges pending. [Docket entry 330-14, Chancery Court Dismissal Order at 1]. In his briefing, defendant Forrest Allgood, who served as District Attorney (DA) during most of the events in this case, offers the opinion that the chancery court should have committed Harris in 2010 based on the doctors' opinions, and "that should have ended the matter right then." [Allgood brief at 7]. In so arguing, Allgood notes that the circuit court's order quoted Rule 9.06 of the Uniform Circuit and County Court Rules, in effect at the time of the proceeding, and ordered that the commitment proceedings "shall proceed not

withstanding the fact that the Defendant has criminal proceedings pending against him." [*Id.* at 6].

Regardless of which of the two state court judges correctly interpreted Mississippi law in this regard, it seems clear that their disagreement led to a very significant impasse in state court. In its order of dismissal, the chancery court purported to transfer the case back to circuit court, but it failed to state that copies were to be served on the circuit court. [Docket entry 330-15 at 2]. In a 2017 order, the circuit judge wrote that, as a result of the failure to serve the chancery court transfer order upon him, he was unaware that the chancery court had declined to conduct the commitment proceedings. [*Id.*]

In his brief, Allgood maintains that, like the circuit judge, he too was initially unaware that the chancery court had failed to conduct the commitment proceedings ordered by the circuit court. In so contending, Allgood writes that:

> Clemons handled the civil commitment proceeding and appeared at the hearing because Allgood had to be in another county on another matter. [Ex. C at 55]. As a result of their busy schedules at the time, Clemons did not immediately inform Allgood that the chancery court had dismissed the civil commitment proceeding. [*Id.* at 55, 57-58]. They had multiple trials being held in different counties, and Clemons "was worried about a lot more things other than that particular order." [*Id.* at 57-58]. Also, the chancery court judge had indicated that he was transferring the case back to the circuit court, so Clemons likely assumed the order would show up in the circuit court docket. [*Id.* at 58]. Allgood assumed that Harris had been committed since there was no evidence to oppose commitment and the chancery court was required by law to commit him. [*Id.* at 54-59, 112].

> Each county in the Sixteenth Circuit Court District had a "progress docket" which dictated what the district attorney and his assistants did day to day. [*Id*. at 60]. The progress docket listed every active case in that county for each term of court, including both cases set for trial and cases not set for trial as a result of, for example, the defendant's ongoing mental evaluation or the defendant absconding. [*Id.* at 60]. When Harris's case was removed from the circuit court's active docket, it was also taken off the progress docket. [*Id.* at 63, 154]. Because the chancery court's order dismissing the civil commitment proceeding was not sent to Circuit Clerk Harrell, Harris's case didn't appear on the progress docket "so there was nothing there to remind anybody that Steven Jessie Harris was anywhere." [*Id.* at 60-63, 154]. "The

chancery court dismissed their particular case. That means he goes back to circuit court and he should have been put on the docket in circuit court. Sadly he wasn't." [*Id.* at 86]. Harris's case is the only one Allgood ever had with these circumstances. [*Id.* at 153-54].

After Harris's case was removed from the circuit court's active docket, Allgood did not talk to anyone about Harris until October of 2012. [Ex. C at 109, 125-26]. Defendant Pearson Liddell, Harris's former public defender, testified that Allgood was "notoriously focused" on the active cases they were handling at the time and did not "go back and visit old cases." [Ex. K at 105]. There was enough to talk about with their active cases. [*Id.*]. Allgood similarly testified that his office handled thousands of cases, and there were only three or four attorneys in the District Attorney's Office. [Ex. C at 29, 53]. Because Allgood and Liddell both had heavy case loads they tended to "take care of the hottest fires, the ones that burn your feet." [*Id.* at 53, 126]. "We·were literally running from the time you got out of the bed until the time you left the office and that included Pierson." [*Id.* at 126]. Harris's case was not a topic of conversation because it was not on the progress docket. [*Id.* ].

[Allgood brief at 7-9].

In his brief, Allgood describes the circumstances of how, in 2012, he first learned of the

impasse in state court as follows:

Allgood first learned about the chancery court's dismissal of the civil commitment proceeding on or about October 2, 2012, when he had a conversation with Liddell. [Ex. C at 51-52, 79-80, 88-89, 109; Ex. P, Motion for Mental Re-Evaluation and Treatment]. While they were talking, Liddell said something that made Allgood realize that Harris was still in jail and had not been committed. [Ex. C at 55-56, 79-80, 88-89, 91]. Allgood does not specifically recall the conversation but it is described in his Motion for Mental Re-Evaluation and Treatment ("Motion for Re-Evaluation") filed six days later. [Id. at 79; Ex. P]. Liddell has no recollection of the conversation but has no reason to think Allgood lied about it. [Ex. K at 101]. Allgood does remember that he panicked because he thought the District Attorney's Office had "dropped the ball" and not pursued the civil commitment. [Ex. C at 55-57, 82, 92, 94, 98-99, 111-12]. Clemons later advised him that she had initiated the chancery court commitment proceeding but that it was dismissed. [*Id.* at 90, 92].

[Allgood brief at 9].

For his part, plaintiff contends that Allgood's denial of knowledge of the chancery court's

order lacks credibility, and his briefing emphasizes different procedural facts than defendant's.

5

Specifically, plaintiff describes the events surrounding the 2010 failed commitment proceedings

as follows:

> Following the unsuccessful last-ditch efforts and desperate efforts of Allgood and Liddell to obtain a new opinion from the examining psychiatrists that Harris had regained his competency over the past two years in which his hearing on his competency was delayed, Allgood had sought another indictment against Harris for "simple assault" stemming from an altercation between Harris and a jailer at the Clay County jail in July of 2010.
>
> On October 11, 2010, despite knowing that just a few days prior on September 29th, that Harris had not gained his competency, as explained by Dr. McMichael, and also knowing that the hearing on Harris' competency would be held the following day, Allgood still pursued and obtained a grand jury indictment against Harris, who he knew would be deemed incompetent to stand trial. The October 11th indictment was filed under seal, and such a seal would not be lifted until Harris was served with a "capias" informing him of the indictment ("Capias"). To date that seal has never been lifted, and Harris has never been served [with the indictment].
>
> On or about October 12, 2010, following the presentation of evidence by Drs. McMichael and McVaugh, as well as argument by Allgood and Liddell, Judge Howard entered an order determining that Harris was incompetent to stand trial, and that there was not a probability that he would regain his competence in the foreseeable future, that Defendant Allgood immediately pursue Civil Commitment proceedings, and ordering Harris to remain in custody until determination of civil commitment proceedings were determined (the "Competency Order").
>
> On or about October 12, 2010, a civil commitment action was initiated by Assistant District Attorney Lindsay Clemons ("Clemons") in the Clay County Chancery Court as required by the Competency Order (the "Civil Commitment Action"). Clemons' highest-ranking supervisor was none other than Defendant Allgood. Further, on or about October 12, 2010, the same day of the Competency Hearing, a "capias" was issued for the October 11th indictment, and delivered to the Clay County Sheriff to be served on Harris.
>
> On or about October 14, 2010, the Chancery Court issued a confinement order to the Clay County Sheriff's Department, headed by Sheriff Huffman, along with Deputy Sheriff, and current Clay County Sheriff Eddie Scott ("Scott"), ordering that Harris be detained pending the outcome of the civil commitment hearing (the "Civil Confinement Order"). On or about October 20, 2010, Special Master Thomas Storey assigned to oversee the Civil Commitment Action, signed an order finding that the Chancery Court lacked jurisdiction to hear this case ("Civil Action Dismissal Order"). Further, the Civil Action Dismissal Order transferred jurisdiction of any proceedings related to Plaintiff, back to the Circuit Court of Clay County for further disposition.

On the same day the Civil Action Dismissal Order was issued, Circuit Judge Howard entered an order to removing Plaintiff's criminal case from the active docket, as the Court had deemed Harris was "not competent to stand trial and ordered civil commitment proceedings to comply with Mississippi Code Annotated § 41-21-63 (1972)" (the "Inactive Case Order").

[Plaintiff's brief at 5-7].

In his brief, plaintiff contends that the interaction between the chancery court's order finding lack of jurisdiction, and the circuit judge's order removing the criminal case from his active docket, required Allgood to immediately terminate the prosecution in this case. [*Id.* at 7]. Plaintiff further notes that, even after Allgood had undisputedly learned of the chancery court order by 2012 at the latest, he took no actions to either dismiss the charges or to institute new civil commitment proceedings. [*Id.* at 8-9]. For his part, Allgood seeks to justify his inaction, even after learning of the state court impasse, by arguing that it would have been futile to do so until the dispute between the chancery and circuit court judges was resolved. Specifically, Allgood writes in this brief that:

> After talking to Liddell [in 2012], Allgood called the Clay County Jail to find out what was going on and apparently talked to the sheriff, most likely former Sheriff Laddie Huffman, who confirmed that Harris was still in jail but was doing better and might be competent to stand trial. [Ex. C at 79-801, 89, 91, 93-94, 107, 109; Ex. P]. Allgood felt he would be remiss if he failed to bring to the court's attention the new information regarding Harris's competency. [Ex. C at 97]. Therefore, he prepared and filed the Motion for Re-Evaluation and attached to it a letter drafted by the Clay County Jail nurse, Defendant Tanya West.2 [Ex. P]. West's letter indicated that she had observed significant improvement in Harris's behavior since beginning a new regimen of injections pursuant to order by a doctor. [*Id.*]. Specifically, she observed that Harris was laughing, joking, and conversing with staff, lacked his previous behavioral problems, volunteered for extra duties, and enjoyed his work at the jail. [*Id.*]. Based on this information, on October 8, 2012, Allgood filed the Motion for Re-Evaluation requesting that the circuit court place Harris's criminal case back on the active docket and order that Harris undergo a re-evaluation to determine his present competency to stand trial and his sanity at the time of the offense. [*Id.*]. Allgood never talked to Liddell about the Motion for Re-Evaluation, and Liddell never saw the motion until this lawsuit was filed. [Ex. C at 111; Ex. K at 99-103, 111-13, 148]. Neither Huffman nor Scott recalls seeing the Motion for Re-Evaluation. [Ex. Q at 81; Ex. R at 83, 85-86, 90-91].

Allgood thinks Clemons told him that the civil commitment proceeding had been dismissed after he filed the Motion for Re-Evaluation. [Ex. C at 92, 104]. As a result, Allgood did not pursue the Motion for Re-Evaluation and did not ask the circuit court to set it for hearing. [*Id.* at 92]. Pursuing a civil commitment in chancery court at that point would not have resulted in a different outcome because Harris's criminal charges were still pending. [*Id.* at 90, 92-93]. Also, it would have been inconsistent to seek relief in the chancery court commitment proceeding when Allgood now believed Harris might be competent to stand trial and he instead chose to file the Motion for Re-Evaluation in circuit court. [*Id.* at 94-95, 147].

At the time, there was an ongoing dispute between the chancellors and the circuit court judges about their respective jurisdiction and authority regarding civil commitment of individuals with pending criminal charges. [Ex. C at 50-51]. The chancellors refused to civilly commit such persons because they said that East Mississippi State Hospital would not accept patients with pending criminal charges. [*Id.*]. Allgood recalls, "The hang-up was between two judges . . . I thought they were in a Mexican stand-off and they were waiting for the other one to blink." [*Id.* at 106]. When Allgood found out the chancery court dismissed Harris's civil commitment proceeding, he "washed [his] hands of it." [*Id.* at 104, 130]. "I thought it was a dispute between the circuit judge and the chancellor and I was not going to get in the middle of a circuit judge and a chancellor. [*Id.*]. "You argue before judges, not with them." [*Id.* at 132].

[Allgood brief at 11-12].

Plaintiff notes that he did not receive the release he sought until two events occurred: 1) his lengthy incarceration without trial began to receive media attention and 2) Allgood was replaced as district attorney by Scott Colom in 2016.  In his brief, plaintiff describes these events as follows:

On information and belief, in or around February or March 2016, Jerry Mitchell ("Mitchell"), a Clarion Ledger writer and reporter, began taking interest in Plaintiff's case. In an article dated March 21, 2016, Mitchell brought to life the fact that Harris, a person suffering from mental illness, remained in "legal limbo" as a detainee at the Clay County jail despite having never been tried, and deemed mentally incompetent by the Court.

In an interview with then newly elected District Attorney Scott Colom ("Colom"), who replaced Defendant Allgood in 2016 as the 16th Circuit Court District, District Attorney, Colom stated that Plaintiff's case had long ago "fallen through the cracks." However, it would seem unbeknownst to Colom, Plaintiff's case did not in fact fall through the

cracks, but instead Plaintiff was the recipient of gross Constitutional violations perpetrated by Defendant Allgood and other Defendants.

On or about May 20, 2016, the day before the Clarion Ledger article was released Marc Amos ("Amos"), assistant district attorney for the 16th Judicial Circuit, and under the direction of Colom, filed a Motion for Relief From Judgment or Order and to Renew Petition for an Order of Commitment (the "Relief From Order and Renewal Motion") as required by State law.  On or about June 7, 2016, the Chancery Court finally issued an Order of Confinement Pending Hearing, the first judicial order permitting Harris to be detained pending the outcome of the new civil commitment proceeding that was commenced by the District Attorney (the "Confinement Order").  . . .

On June 15, 2016, the Chancery Court entered a commitment order finally removing him from his jail cell he had spent so many years unlawfully detained in, and transferred to a medical care facility to treat him for his severe mental illnesses ("2016 Commitment Order").  From the period of October 20, 2010 through June 7, 2016, a period of nearly 6 years, it is irrefutable that Plaintiff was unjustifiably and unlawfully imprisoned at the Clay County jail, as Plaintiff was neither a pretrial detainee nor a convicted prisoner, and no such confinement order existed during this period of time.

On April 28, 2017, after the District Attorney filed another motion for re-evaluation of Plaintiff's competency, upon review of the supporting evidence, the Circuit Court once again ruled that Plaintiff was mentally incompetent, and that it remained the treating physician's opinion "to a reasonable degree of medical and psychological certainty, that there is no substantial probability that Mr. Harris can be restored to competence to proceed legally within the foreseeable future. Mr. Harris remains severely and persistently mentally ill".

On July 25, 2017, District Attorney Colom filed a Motion to Nolle Prosequi, on the grounds that it is unconstitutional to hold indefinitely.  On July 25, 2017, the Circuit Court entered an order granting the Motion for Nolle Prosequi, having found the following, the State of Mississippi, through the 16th Judicial Circuit District Attorney followed the Mississippi Supreme Court in committing Harris, that it was against both the United States Constitution and the laws of the State of Mississippi to hold a person deemed incompetent indefinitely, and on that basis dismissed the action for lack of prosecution.

On August 15, 2017, Plaintiff was granted his freedom and released to his family where he  has remained, and is treated with continuous medical care for his severe mental disabilities.

[Plaintiff's brief at 16-18]. Plaintiff thus presently finds himself a free man, but he has filed this action seeking recovery for what he contends to have been a gross violation of his constitutional rights.

This court notes two events in this case which do not fit neatly within a discussion of its complex procedural history, but which nevertheless figure prominently in this lawsuit. The first event, which concerns this court greatly, is described in plaintiff's brief as follows:

> [K]nowing that Judge Howard had removed Harris' case from the active docket, removing its attention from the Court, on October 25, 2010, Allgood, Scott and Huffman conspired to further hide Harris from the courts, while justifying their unlawful imprisonment, by submitting a declaration to the Court stating that the following as it relates to the Capias, "After diligent search and inquiry, I have been unable to find the within named Stephen Jesse Harris in my county," signed Sheriff Laddie Huffman and Deputy Sheriff Eddie Scott (the "Sheriff's Diligence Declaration"). The brazen absurdity of such a diligence declaration was mind boggling given the fact that in fact Defendants Huffman and Scott were both well aware that Harris was in their custody at that very time.

 [Plaintiff's brief at 10-11].

While it is unclear how this particular evidence implicates Allgood, it is very disturbing that both then-Sheriff Huffman and Deputy Scott (who later took over from Huffman as Sheriff) would certify in 2010 that they were unable to locate plaintiff even though they were, it seems clear, aware that he presently found himself locked up in their jail. Although it is unclear to this court how much an impact this certification had upon plaintiff's continued incarceration, it certainly raises troubling questions.

A second factually distinct event requiring discussion concerns an alleged incident of forced medication as to which two of the most prominently involved parties, former defendants Edmund Miller, M.D. and Tanya West, RN, have since reached settlements with plaintiff. Plaintiff still maintains claims against Sheriff Huffman in this regard, however, and Huffman has sought summary judgment on these claims.

10

In his brief, Huffman argues that he was merely acting pursuant to orders from medical professionals and that the medication was reasonable under the circumstances. Specifically, Huffman argues that "Harris' attempt to place responsibility on [Huffman] for a single forced administration of anti-psychotic medication is unavailing since the order for such administration came from a medical doctor after Harris assaulted jail personnel and thus was medically necessary under the circumstances." [Huffman brief at 1].

This court notes that plaintiff's brief offers substantial support for the notion that Dr. Miller and Nurse West were, in fact, the driving forces behind his forced medication. Specifically, plaintiff argues in his brief as follows:

> Sometime in or around January 2012, Defendant West approached Dr. Miller about Harris, a schizophrenic, whom she believed had not been taking antipsychotic medications for some time prior to her employment, and being aware that Harris had been refusing to take the oral medications provided.
>
> In or around late January 2012, although, Dr. Miller never personally examined Harris, he prescribed to Harris Prolixin, a new antipsychotic medication that Harris had never previously taken, to be administered by injection. On or around January 27, 2012, Defendant Miller instructed West to administer the Prolixin to Harris.
>
> On or around February 6, 2012, Defendants West and Huffman attempted to administer the Prolixin to Harris, and in response Harris refused. Following those threats, West then administered the Prolixin in Harris' arm against his will.
>
> Following this physical ordeal, and as a result of the threats issued to him by the jailer, Harris consented to the continued administration of the antipsychotic medication under duress. Defendant West was aware that forcibly administering antipsychotics drugs against a patient's will, was improper. However, despite this understanding she participated in the February 6, 2012 act any way.

[Plaintiff's brief at 11-12].

While plaintiff thus appears to allege that Dr. Miller and Nurse West had the most prominent roles in allegedly medicating him against his will, he does allege that Huffman personally held him down to receive the medication. Specifically, plaintiff contends in his brief

that "[a]fter Harris refused, Huffman caused Harris to be restrained by handcuffs, and held down by several jailers, including Huffman who had placed his hands around Harris' neck. Harris continued to refuse, and was threatened by a female jailer that if he did not accept the shot, they would put the medicine in his food." *Id.* at 12.

Having discussed what it regards as the most important factual and procedural events of this complex case, this court now turns to a discussion of the pending motions.

**DISCUSSION**

**A.  Claims asserted against District Attorney Forrest Allgood.**

This court addresses first the motion for summary judgment filed by former DA Forrest Allgood, which relies heavily upon immunity grounds.  In considering the immunity issues raised by Allgood, this court first notes that plaintiff's concession that he has no valid Americans With Disability Act (ADA) claim against this defendant clearly resolves the issue of Eleventh Amendment Immunity raised by Allgood as to the claims against him in his official capacity. [Plaintiff's brief at 38].  As discussed in this court's prior order, [slip. op. at 10-12] it is well settled that such official capacity claims against a Mississippi prosecutor are tantamount to an action against the State itself, to which Eleventh Amendment immunity generally applies.  *See, e.g. Brooks v. George Cty., Miss.,* 84 F.3d 157, 168 (5th Cir. 1996)  The fact that plaintiff had initially asserted an ADA claim against Allgood at least raised the possibility that such ADA claims would serve to bypass Eleventh Amendment immunity, but, since those claims are now

conceded to lack merit, plaintiff has no argument that Eleventh Amendment immunity does not apply in this case. Allgood's motion to dismiss the claims asserted against him in his official capacity, on the basis of Eleventh Amendment immunity, will therefore be granted.

This court now turns to the claims asserted against Allgood in his individual capacity, and it seems clear that the law relating to absolute prosecutorial immunity is the legal battleground upon which the question of Allgood's personal liability must initially be fought. As discussed below, however, it is well settled that prosecutors may raise a qualified immunity defense even in cases where absolute prosecutorial immunity is found to be inapplicable, and it can scarcely be doubted that qualified immunity is, in its own right, a quite robust immunity doctrine. Plaintiff must surmount both of these formidable obstacles in order to obtain recovery against Allgood in his individual capacity, and this court will address his absolute prosecutorial immunity defense first.

While, as discussed below, this court finds the immunity arguments raised by Allgood to be meritorious, this conclusion should not, by any means, be understood as an endorsement of the manner in which he prosecuted this case. This court does acknowledge that the impasse between the chancery and circuit court judges in this case presented Allgood with a unique and difficult legal challenge, and it has considerable doubts regarding plaintiff's assertion that, once this impasse arose, the DA's only lawful option was to immediately dismiss the charges against him. This court suspects, for example, that Allgood could have sought emergency appellate relief with the Mississippi Supreme Court in which he explained the issues at stake and sought an immediate order compelling either the circuit or chancery judges to conduct the required civil commitment proceedings.

While this court thus believes that Allgood was entitled to take some time to deal with this unexpected and unique legal situation, his decision to essentially do nothing for years is one which is difficult to reconcile with the U.S. Constitution. While this court thus regards Allgood's decision to do nothing for a period of years in response to the impasse in state court to have very likely been the incorrect one, it has no reason to doubt that this decision was, for better or worse, a **prosecutorial** one. Ultimately, that is the crucial point in this context, since absolute prosecutorial immunity protects even those prosecutors who, in the exercise of their core prosecutorial duties, commit constitutional violations arising out of motivations far more reprehensible than an (apparent) desire to protect the public. Consider, for example, a hypothetical case in which a wrongly-convicted plaintiff presents proof that the prosecutor had expressed to third parties an awareness of his factual innocence but that he nevertheless prosecuted him out of personal animus. It is difficult to imagine a more egregious fact pattern than this one, and yet it seems clear that the prosecutor's decision to prosecute would be protected by absolute immunity.

While this court believes that it can reasonably be questioned whether such blanket immunity for prosecutorial acts *should* in fact be the law, the U.S. Supreme Court has held that it is. In the seminal case of *Imbler v. Pachtman,* 424 U.S. 409 (1976), for example, the Supreme Court afforded absolute immunity to a prosecutor who was sued for damages for knowingly using perjured testimony that resulted in an innocent person's conviction and incarceration for nine years. In so ruling, the Supreme Court concluded that anything less than absolute immunity risked "harassment by unfounded litigation [that] would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions

instead of exercising the independence of judgment required by his public trust." *Imbler,* 424 U.S. at 423.

With this law in mind, this court expressed, in a March 2020 order, its inclination to conclude that Allgood's actions in this case, constitutional or not, were prosecutorial in nature and thus subject to absolute immunity. Specifically, this court wrote that:

> While this court is inclined to agree with defendant that he was, in fact, acting as a state prosecutor throughout this case, it concludes that this issue is better addressed after the completion of discovery. In so stating, this court emphasizes that absolute prosecutorial immunity is considerably more limited in scope than, say, absolute judicial immunity. For example, the U.S. Supreme Court has rather strictly limited absolute prosecutorial immunity to core prosecutorial functions which are "intimately associated with the judicial phase of the criminal process," and it has not extended that immunity to "investigative" and other similar functions. *See, e.g. Buckley v. Fitzsimmons*, 509 U.S. 259, 262 (1993). Based on the limited facts available to this court at this juncture, this court is not prepared to definitively state whether or not Allgood might have "crossed the line" into non-core prosecutorial functions in this case, such as through his role in medicating plaintiff to have him declared competent for trial. Thus, while this court may eventually agree with Allgood that he enjoys absolute immunity as to all claims against him, it concludes that these issues would best be addressed on summary judgment, at which time this court will, presumably, have a much more complete understanding regarding the actions which he took in this case.

[Docket 135-1, slip op at 18].

As quoted above, this court raised the possibility that, if Allgood were found to have ordered or participated in plaintiff's forced medication, then such actions might not represent core prosecutorial functions as to which absolute immunity applies. The reasons for this court's conclusion in this regard should not be difficult to discern: a prosecutor's job is to prosecute cases, not to participate in the medical treatment of criminal defendants. Having said that, this court notes parenthetically that, even if the proof in this case demonstrated that Allgood had, in fact, participated in the decision to medicate plaintiff to make him competent to stand trial, defendant might, at least conceivably, still have a good faith argument that absolute immunity still applied. In so stating, this court notes that, in the *Buckley* decision quoted above, the

15

Supreme Court wrote that "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley*, 509 U.S. at 273.

These two categories, relating to "investigatory" (or "investigative") and "administrative" functions have been repeatedly affirmed by the Supreme Court and the Fifth Circuit as serving as the basis for the absolute prosecutorial immunity analysis. *See, e.g. Loupe v. O'Bannon*, 824 F.3d 534, 539 (5th Cir. 2016); *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988); *Brooks v. George Cty., Miss.*, 84 F.3d 157, 168 (5th Cir. 1996). While this court has considerable doubt whether participating in the medical treatment of a prisoner, even with a goal of making him fit for trial, is a core prosecutorial function, it might have had a difficult time fitting such actions in either the category of "investigatory" or "administrative" actions as to which absolute immunity does not apply under Supreme Court and Fifth Circuit precedent. This court therefore anticipated that it might face a very difficult and uncertain legal analysis if the proof during discovery demonstrated that Allgood did, in fact, participate in plaintiff's medical treatment.

As it turns out, however, plaintiff developed no incriminating evidence regarding Allgood's participation in his medical treatment, and he instead relies upon a much more tenuous (and dubious) legal argument that, in allegedly providing certain legal advice long after the prosecution in this case had begun, Allgood crossed the line into non-prosecutorial activities as to which absolute immunity should not apply. In arguing that absolute prosecutorial immunity does not apply in this case, plaintiff, citing *Burns v. Reed*, 500 U.S. 478 (1991), argues that "providing legal advice to law enforcement was not a function closely associated with the judicial process" and is thus exempt from absolute immunity. [Brief at 31].

16

The notion that a prosecutor's act of "providing legal advice to law enforcement," no matter the time period or context involved, constitutes non-prosecutorial conduct as to which absolute immunity does not apply is not only unsupported by the language of the *Burns* decision upon which plaintiff relies, it is directly contradicted by it. Indeed, even a cursory reading of *Burns* makes it clear that this decision only exempted from the protection of absolute immunity pre-prosecution advice to police officers which was given as part of the investigative process, and not, as plaintiff suggests, all "advice given to law enforcement." This fits, of course, the overall thrust of Supreme Court precedent in this context, which is to only recognize exceptions to absolute immunity for conduct which can be characterized as either "investigative" or "administrative" in nature. In *Burns*, the Supreme Court wrote that "[w]e do not believe … that advising the police in the investigative phase of a criminal case is so 'intimately associated with the judicial phase of the criminal process,' that it qualifies for absolute immunity." *Burns*, 500 U.S. at 493. Lest there be any doubt regarding the Supreme Court's intent in this regard, it further explained in *Burns* that:

> [W]e note that one of the most important checks, the judicial process, will not necessarily restrain out-of-court activities by a prosecutor that occur prior to the initiation of a prosecution, such as providing legal advice to the police. This is particularly true if a suspect is not eventually prosecuted.

*Id.* at 496.

The Supreme Court in *Burns* thus made it clear that it regarded the act of "providing legal advice to the police" as something which "occur[s] prior to the initiation of a prosecution," and it can scarcely be doubted that this will ordinarily be the case. It can be argued that this was a somewhat sloppy formulation by the Supreme Court, since it is possible to imagine scenarios in which a prosecutor provides legal advice to a police officer even after the initiation of a prosecution. The Supreme Court made it clear that it was not referring to such scenarios in

17

*Burns*, however, by making explicit reference to acts of "advising the police in the investigative phase of a criminal case." *Id.*

It appears to this court that, in relying upon *Burns*, plaintiff essentially seeks to take one sentence of the opinion out of context, namely the Supreme Court's concluding statement that "[i]n sum, we conclude that respondent has not met his burden of showing that the relevant factors justify an extension of absolute immunity to the prosecutorial function of giving legal advice to the police." *Id.* at 496. As noted previously, however, the Supreme Court had already made clear that it was discussing *pre-prosecution* advice given as part of a criminal investigation, and this one sentence clearly does not serve to negate those previously-written words.

While this court thus believes that the Supreme Court made its intentions in *Burns* very clear even in that decision, subsequent decisions have removed any doubt which might even arguably exist in this context. In *Van de Kamp v. Goldstein*, 555 U.S. 335, 343, 129 S. Ct. 855, 861 (2009), for example, the Supreme Court cited *Burns* for the proposition that "[w]e have held that absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation." Moreover, the Fifth Circuit reiterated just last year that "absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation." *Singleton v. Cannizzaro*, 956 F.3d 773, 781 (5th Cir. 2020).

The above precedent is, once again, fully consistent with the overall approach adopted by the Supreme Court and the Fifth Circuit of only recognizing "investigative" and "administrative" actions as being exempt from absolute immunity. Indeed, it should be emphasized that plaintiff does not even attempt to argue that either of the instances of legal advice provided by Allgood in this case fell under either of these categories. Accepting plaintiff's reading of *Burns* would thus

18

require this court to ignore the Supreme Court's own words in that decision, its interpretation by subsequent Supreme Court decisions, as well as the overall thrust of well-settled absolute immunity jurisprudence.

This court has refrained from discussing plaintiff's specific proof regarding the advice allegedly provided by Allgood, since it deemed it important to first correctly establish the governing law in this case. Having done so, this court will now proceed to his evidence on this issue. In his brief, plaintiff writes that:

> Here, there are at least two instances in which Defendant Allgood provides legal advice to law enforcement, which establish a constitutional violation. First, following the issuance of the Commitment Order dismissing the commitment proceeding, Defendant Huffman sought advice from Defendant Allgood as to what steps should be taken to address Harris, given that the Chancery Court declined to commit him, and he was deemed incompetent to stand trial. Although Defendant Allgood testified that it was until October 2, 2012, nearly two years after the Commitment Order was issued, that he was made aware that Chancery Court had dismissed Harris's commitment action, and that Harris had remained confined at the Clay County jail that entire time, Defendant Huffman testified to a radically different story as to what Allgood knew. Defendant Huffman testified as follows:
>> Q. Okay. Do you recall speaking to either Forrest Allgood or any of his assistant district attorneys about the decision in the Chancery Court case?
>> A. Yes. Tried to get it resolved.
>> Q. Okay. And so you took some steps at some point, you spoke to the District Attorney, Forrest Allgood, and you guys had a conversation about why Mr. Harris was still in your jail?
>> A. Not why. I knew why he was in jail.
>> Q. Okay. Well, after the commitment proceeding was dismissed, you knew why he was in jail because it had been transferred back to the Circuit Court, correct?
>> A. I knew he was in jail because of the charges that he had against him in Circuit Court.
>> Q. Yes. Correct. Absolutely. And so after that you spoke to, you said you spoke to Forrest Allgood about getting this resolved, right, fixing this situation so either he's back being committed again or something else, right? What did you discuss? You were kind of talking about it but I didn't get the full details, if you recall.
>> A. We talked about his charges. And I told him I didn't need to be housing him over there in the jail if he's insane or incompetent. I talked with him and I talked with the judge but I couldn't get nothing done. So I just waited on the orders from the court.

[Plaintiff's brief at 31].

This supposedly incriminating testimony from Sheriff Huffman strikes this court as vague at best. Indeed, it seems entirely unsurprising that, in a case of this nature, jail officials would, at some point, go to the prosecutor and ask what his legal strategy was, and it appears that Huffman did just that. In the above-quoted passage, the closest Huffman comes to testifying exactly what Allgood might have said in response to his inquiry is his statement that:

> We talked about his charges. And I told him I didn't need to be housing him over there in the jail if he's insane or incompetent. I talked with him and I talked with the judge but I couldn't get nothing done. So I just waited on the orders from the court.

[*Id.*] As best this court can tell, there is nothing in Huffman's testimony which describes conduct that can be fairly regarded as legal advice of any sort which Allgood provided to him.

In providing his own "spin" on Huffman's rather vague testimony, plaintiff writes that:

> Based upon Huffman's deposition testimony, along with the facts set forth herein, it was clear that Huffman sought Defendant Allgood's advice on how to keep Harris confined until he regained his competency to be tried for the alleged crimes. In following Allgood's legal advice, Defendant Huffman utilized the Capias as his justification for Harris's continued confinement at the Clay County jail, despite the fact that Harris should have been released. Although Allgood's self-serving testimony that prior to October 2, 2012, he had no knowledge that the Chancery Court dismissed the commitment proceedings to one of his major cases, and that he was completely unaware that Harris had still being detained at the Clay County jail two years following the dismissal of the commitment action, directly contradicts Defendant Huffman's testimony, which states otherwise, once again Allgood's deposition testimony supports Huffman's recollection of the events following October 20, 2010, stating:
>
> > Q. Correct. So therefore we're not going to go off a hypothetical, we're going to go off of reality. Given the fact that there was no other civil commitment proceeding pending, the only alternative between the period of October 20th, 2010 and October 7th, 2010 was that Mr. Harris must have been released pursuant to Jackson v. Indiana; is that correct?
> > MR. SHANNON: Objection It's been asked and answered several times. You can respond again.
> > A. And I disagree because just because a civil commitment has not been held the reality is that doesn't mean it can't yet be held. The sheriff's office got the guy and was told to hold him by two sources, first on the capias from the grand jury; second, on an order from the chancery court. The chancery court dismissed their particular case. That means he goes back to circuit court and he should have been put on the docket in circuit court. Sadly he wasn't. But nonetheless, in the eyes of

the sheriff's office they're still holding a capias on a grand jury indictment and that's their authority to hold him and to hold him until there is a disposition. Defendant Allgood's deposition testimony set forth above, mirrors the exact action in which Huffman implemented following his conversation with Allgood relating to Harris, his "charges" and what to with him following the dismissal of the commitment action.

[Brief at 32-33].

Plaintiff thus infers, based on the evidence as a whole, that Allgood essentially told Huffman the legal strategy which he had chosen to follow in light of the disagreement between the circuit and chancery judges and recommended that he get in line with that strategy. While this court does not believe that Huffman's testimony, quoted above, indicates this to be the case, it will (rather generously) assume for the purpose of this order that this actually occurred. This court's decision to so interpret the evidence is based partly upon plaintiff's proof regarding the second alleged instance in which Allgood provided legal advice, namely to the newly appointed jail administrator.[2] As to this instance, plaintiff writes in his brief that:

Sometime shortly after Huffman resigned as jail administrator at the end of 2012, the new jail administrator approached Allgood to seek legal advice as to what they should do about Harris, whom everyone know should not be held at the Clay County jail. [Allgood] responded as follows:
Q. Do you recall if Sheriff Scott at any point in time while you remained district attorney for Clay County for the 16th circuit, do you recall him making any more inquiries as to what he should be doing with Mr. Harris?
A. I had a conversation and I cannot say it was with Eddie Scott. I'm not sure who I had it with. It was with somebody from the jail. I want to say it was Billy Perkins.
Q. I'm sorry. You want to say it was who?
A. Billy Perkins. He was the jail administrator at the time.
Q. Okay.
A. Sometime after that motion was filed I believe Billy Perkins came to my office about this and he wanted to go see the Judge if memory serves me correct and he wanted me to go with him. **And I don't remember the exact words, I know I told him you can do what you want to, I'm not going, that's between those two judges and I'm not getting in it. I know I told him that. And I know I said something to him that was discouraging, I don't know what it would be,**

---

[2] The parties appear to harbor some uncertainty regarding this administrator's name, since they repeatedly refer to him by his job title. This court will do likewise.

> **something to the effect that if I was in your place I wouldn't go either or something like that**, once again, based on the fact that I thought that this was a spat between two judges and getting in the middle of those two judges was not a good idea for anybody.
>
> Defendant shamelessly forced everyone to get in line with the Plan originally devised by him, Huffman and Liddell.

[Plaintiff's brief at 14-15 (emphasis in original)].

In light of this proof, this court will assume for the purposes of this motion that, as plaintiff contends, Allgood told both Huffman and the new jail administrator what his legal strategy as a prosecutor was and recommended that they get on board with it. While this may be a generous assumption as to Huffman, this court views it as essentially immaterial, since it can discern no valid argument that the Supreme Court's holding in *Burns* covers this alleged legal advice provided by Allgood to either the Sheriff or to the jail administrator.

As noted previously, plaintiff relies heavily upon the statement by the Supreme Court in *Burns* that "we conclude that respondent has not met his burden of showing that the relevant factors justify an extension of absolute immunity to the prosecutorial function of giving legal advice to the police." [*Id.*] After taking this statement out of context of the full discussion in *Burns*, plaintiff then takes it upon himself to change the word "police" to "law enforcement," presumably to better apply to Sheriff Huffman. It seems clear to this court, however, that plaintiff's own proof and arguments support a conclusion that the alleged advice given to both Huffman and the jail administrator were in their capacities as *jailers* who were responsible for maintaining physical custody over him during his prosecution. This seems obvious enough in the case of the jail administrator, but it is also true in the case of Huffman, who, as a Mississippi sheriff, wears a number of different hats. It is clear that in this case, plaintiff takes issue with Huffman not with regard to the manner in which he carried out police functions such as investigating and arresting him, but, rather, the fact that he continued to keep him in jail even

after the impasse in state court. This court thus concludes that the advice in this case does not even fit under plaintiff's highly selective reading of *Burns*, which cannot, under any stretch of the imagination, be understood to include jailers.

In arguing that absolute immunity does not apply, plaintiff emphasizes not Allgood's own strategy as prosecutor, but rather his alleged advice that county officials get on board with it. Nevertheless, it seems clear to this court that adopting plaintiff's position would drive a gaping hole in absolute prosecutorial immunity as a defense, and he fails to provide legal authority to support such a holding. In the court's view, the notions that 1) county officials would have sought to learn a prosecutor's legal strategy 2) that he would have told them what that strategy was and 3) recommended that they get on board with it constitute rather unremarkable and predictable events in a case of this nature. This court notes that plaintiff does not even argue that it was improper for Allgood to tell county officials who asked what his *own* legal strategy was, and it would be difficult for him to contend otherwise. Moreover, it strikes this court as rather unrealistic to think that, having told such officials what he thought the correct legal strategy in this case was, that Allgood would have recommended to those officials that they do anything differently than what he had just told them he thought was the proper course of action.

Plaintiff's argument that providing post-prosecution advice regarding a matter of core prosecutorial strategy serves to bypass absolute immunity strikes this court as being an extraordinary one which cries out for supporting authority. Plaintiff offers no authority suggesting that absolute immunity applies to any post-prosecution advice, and it seems particularly unlikely to this court that advice which urged third parties to get on board with a prosecutor's legal strategy would be held to fall outside of the scope of absolute immunity. In so

23

stating, this court emphasizes that the formulation and execution of such a legal strategy represents the very core of a prosecutor's duties, and the notion that absolute immunity would simply disappear the moment a prosecutor urged others to act consistent with his strategy seems highly suspect.

This court's conclusion that absolute immunity covered the post-prosecution advice given by Allgood is likewise supported by the nature and subject matter of that advice. Indeed, as Allgood points out in his brief, the Supreme Court indicated in *Van de Kamp* that even conduct which might otherwise be considered "administrative" and thus potentially outside the scope of absolute immunity would still be protected by absolute immunity if it "necessarily require[s] legal knowledge and the exercise of related discretion." *Van de Kamp*, 555 U.S. at 344. As discussed previously, the advice allegedly given by Allgood related to a rather difficult legal dilemma arising from the fact that two state court judges were engaged in a disagreement regarding whose responsibility it was to conduct civil commitment proceedings. While this court has, once again, serious doubts regarding whether Allgood adopted the constitutionally *correct* decision as to how to respond to this impasse, it agrees with him that this decision "necessarily require[d] legal knowledge and the exercise of related discretion" within the meaning of *Van de Kamp*.

Thus, even assuming, purely for the sake of argument, that Allgood's alleged advice to Huffman and the jail administrator could somehow be considered either "investigatory" or "administrative" in nature, that advice would still relate strongly to an attorney's knowledge of the judges involved, the legal obligations relating to the impasse between those judges, and the exercise of discretion regarding the best way to proceed in this situation. Of course, this court sees no valid argument that the advice at issue in this case could possibly be considered

"investigatory" or "administrative" in the first place, but it agrees with Allgood that, even if it could be, *Van de Camp* would still render absolute immunity applicable. This court therefore concludes that there are multiple, independently-sufficient reasons why Allgood's alleged legal advice in this case is protected by absolute immunity, and his motion for summary judgment is therefore due to be granted on this issue.

This court now turns to Allgood's alternative argument that he is protected by qualified immunity, which it chooses to address out of an abundance of caution, in the event that it is held to have erred in finding absolute immunity applicable in this case. To defeat a claim of qualified immunity, a plaintiff must show that (1) the plaintiff has alleged that the defendant has violated a clearly established constitutional or statutory right, and (2) a reasonable person would have known of that clearly established right. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008). When analyzing the second prong, the court must "consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007). "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Id.*

While less than absolute, qualified immunity is, of course, a very robust immunity doctrine in its own right which has led to the dismissal of many civil rights lawsuits in federal court. Part of the power of the qualified immunity doctrine arises from the fact that it must simply be raised as a defense by a defendant, and the plaintiff has the burden of establishing the proof and arguments necessary to overcome it. *See Pierce v. Smith*, 117 F.3d 866, 871–72 (5th

Cir.1997) (noting that the plaintiff bears the burden of demonstrating that an individual defendant is not entitled to qualified immunity).

With the foregoing authority in mind, this court turns to the parties' arguments on the qualified immunity issue. Since the qualified immunity standard makes a greater inquiry into the nature of the defendant's alleged conduct, this court wishes to take this opportunity to comment on this issue. It appears to this court that all defendants in this case were subjectively motivated by a desire to protect the public from an individual who was indicted on, and never acquitted of, charges that he murdered his father, shot three law enforcement officers, car-jacked two college students, stabbed another car jacking victim, shot into multiple occupied vehicles, and escaped the scene by car-jacking and kidnapping. [Dkt. #39-3 pp 2-8.] Indeed, even plaintiff alleges in his brief that:

> Huffman admitted that he reached out to Dr. McMichael and was frustrated by the fact that the Mississippi Department of Health didn't "have a criminally insane program to house the criminally insane until they get them back to their sanity and get their holding over with." Having come to the conclusion that another commitment hearing would not accomplish their goal, which was to try Harris for the crimes alleged against him, Allgood and Huffman were left with few alternatives to keep Harris confined, with the hope that Harris would one day regain his sanity and be tried for the crimes he was charged with.

[Plaintiff's reply brief at 25].

In the court's view, it is typical of plaintiff's (futile) efforts to make the issues in this exceedingly difficult case seem to be clear-cut that he harshly criticizes the defendants for not simply releasing an individual indicted for horrific crimes upon the public. Indeed, plaintiff appears to acknowledge himself that the State of Mississippi has made inadequate expenditures to treat the criminally insane while protecting the public at the same time. If this is true, and it does appear to be the case, then this is a truly regrettable fact which cannot be attributed to any

of the defendants in this action.[3]  Moreover, this court cannot pretend that it lacks sympathy, on a human level, for defendants' alleged reluctance to make recourse to civil commitment proceedings which, by plaintiff's seeming admission, would not have actually protected the public.

While this court thus has a certain sympathy for defendants' predicament on a human level, it is, at the end of the day, sitting in its capacity as a federal judge charged with enforcing the U.S. Constitution.  In this capacity, this court cannot pretend that it is acceptable for an individual such as plaintiff to be kept incarcerated for many years with no conviction and without being afforded the rights guaranteed to him by U.S. Supreme Court precedent such as *Jackson*.  It is, once again, truly regrettable if the State of Mississippi elects to place a higher priority on saving money than on protecting its citizens, but, at the end of the day, the requirements of the U.S. Constitution in this context are non-negotiable.  This court is thus committed to enforcing the requirements of the U.S. Constitution in this case, and it now turns to a discussion of some of the facts of this case relating to the allegations against Allgood.

In the court's view, Allgood's key error as a prosecutor in this case was in not filing an emergency appeal with the Mississippi Supreme Court regarding the impasse in state court, once he learned of it.  Indeed, filing an appeal is the well-established means for dealing with erroneous decisions by trial courts, and this court can discern no reason why Allgood would not have done so in this case.  At the same time, the decision whether or not to file such an appeal is clearly and indisputably a *prosecutorial* decision, as to which absolute immunity applies.  Plaintiff offers no

---

[3] In so stating, this court admits to considerable uncertainty regarding the issue of to what extent Mississippi law and its mental health facilities would have allowed the public to be protected in the event that civil commitment proceedings had gone forward in 2010.  While it appears that this protection would have been rather limited, this court looks forward to a clarification of this issue at trial.

authority even suggesting otherwise, and this court will therefore set aside this error for the purposes of its qualified immunity discussion.

In reading plaintiff's arguments on the qualified immunity issue, it appears that they are based upon a fundamental misconception of the nature of the qualified immunity defense as it relates to the claims against Allgood. Specifically, plaintiff's appears to assume that, if he can demonstrate that the one sentence allegedly spoken by Allgood to the jail administrator and Sheriff Huffman, during the course of a prosecution which lasted years, is not subject to absolute immunity, then that removes absolute immunity from the table completely as a defense in this case, and he can seek to meet the stringent requirements of qualified immunity with regard to even core prosecutorial actions by Allgood. That is simply not the law, however.

The Fifth Circuit recently reiterated that "a prosecutor is afforded only qualified immunity for acts performed in the course of 'administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings.' " *Wooten v. Roach*, 964 F.3d 395, 407 (5th Cir. 2020), citing *Loupe*, 824 F.3d at 539. The Fifth Circuit has thus made clear that a prosecutor is merely entitled to qualified immunity for specific acts which fall outside of the scope of absolute immunity but implicit in this statement is that he continues to enjoy complete immunity for core prosecutorial functions. Of course, this court has previously concluded that the advice given by Allgood to the jail administrator cannot fairly be characterized as either "administrative" or "investigatory" in nature, and it has therefore concluded that absolute immunity applies to that advice as well. This court's present analysis of the qualified immunity issue is based on an assumption that it erred in making this finding, but, even in this scenario, this would merely mean that the lesser qualified

immunity defense only applies to *that specific action* by Allgood. Plaintiff's arguments in this case do not reflect this fact.

In briefing the qualified immunity issues in this case, plaintiff does not limit himself to the post-prosecution advice allegedly given by Allgood to the jail administrator and Huffman, which represents the only prosecutorial conduct as to which he even has an argument that absolute immunity does not apply. Instead, plaintiff seeks to argue that Allgood's *entire course of action* in continuing to prosecute this case, even after the impasse in state court, violated clearly established law. For example, plaintiff argues that:

> As evidenced above, and set forth in *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) and *Brown v. Jacquith,* 318 So. 2d 856 (1975) the law is clearly established that a person deemed mentally incompetent where there is no probability that they will regain competence in the foreseeable future, they must either be committed or released, as they are a free ordinary citizen. Here, Defendant Allgood engaged in acts or omissions by prosecutors where their activities are no longer advocating on behalf of the state. As set forth above, Defendant Allgood was the ring leader in causing some of the worst Constitutional violations committed to anyone in this. As a prosecutor, an actor on behalf of the State, pursuant to the Supreme Court of Mississippi and the Constitution of the United States, Defendant Allgood was required to commit Mr. Harris or cause his release once he was deemed incompetent to stand trial. As set forth by the evidence throughout this Opposition, Defendant Allgood continuously, in spite of the clearly established law, did everything he could to keep Harris unlawfully confined at the Clay County jail, with the assistance of Defendants Huffman and Scott. . . .

> As District Attorney Colom properly did, he first committed Harris through the civil commitment process, and then he dismissed the case when it was clear Harris would not regain his competency in the foreseeable future. Despite Defendant Allgood's argument that there is no clearly established law requiring him, an agent acting on behalf of the state, to either commitment Harris or release him, both *Jackson v. Indiana* and *Brown v. Jacquith* make it clear that Allgood is required to do so. In informing the Judge Howard that Harris was being unlawfully detained at the Clay County jail, would not have obligated Allgood to represent Harris at all, but instead, adhere to the oath of protecting the Constitution and ensuring justice be done. Such an act did not require a motion to the Court, or anything more than Allgood advising Judge Howard during any court appearance before his bench. Allgood did not act as a reasonable prosecutor would, and this was reflected by the subsequent actions taken by District Attorney Colom, who did act as any reasonable, minister of justice would do.

[Plaintiff's brief at 36-37].

It is thus apparent that plaintiff has failed to limit his qualified immunity arguments to the one act on the part of Allgood on which he has a good faith argument that absolute immunity does not apply, namely the advice allegedly given to two individuals acting in their capacities as jailers, that they "get on board" with his prosecutorial strategy not to get in the middle of a dispute between two judges. Plaintiff instead seeks to essentially bring Allgood's entire course of handling this case back on the table, and this is improper. Even assuming that plaintiff is correct, as argued above, that "[a]s a prosecutor . . . Defendant Allgood was required to commit Mr. Harris or cause his release once he was deemed incompetent to stand trial" the crucial fact is that these actions listed by plaintiff are, without question, core prosecutorial acts which are protected by absolute immunity. Indeed, plaintiff, does not even make a pretense otherwise, openly framing his qualified immunity arguments in terms of what Allgood was required to do "as a prosecutor." Such arguments have no place in a qualified immunity argument against a prosecutor clearly protected by absolute immunity with regard to the vast majority of his actions, and this court could therefore reject his arguments on this basis alone.

A second weakness in plaintiff's qualified immunity arguments relates to the authority which he cites in order to meet the crucial "clearly established" prong of the qualified immunity standard. While the "clearly established" prong of the qualified immunity standard has been widely criticized by commentators and judges throughout the country and continues to mandate harsh outcomes, it remains binding precedent which this court is bound to follow. In *Plumhoff v. Rickard*, 134 S. Ct. 2012, 188 L.Ed.2d 1056 (2014), the Supreme Court described the "clearly established" prong as follows:

An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was " 'clearly established' " at the

> time of the challenged conduct. Ashcroft v. al–Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id.,* at 2083–2084. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." *Ibid.* In addition, "[w]e have repeatedly told courts ... not to define clearly established law at a high level of generality," id., at 2074, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

*Plumhoff*, 134 S.Ct. at 2023.

The U.S. Supreme Court has thus stressed that plaintiffs' burden of demonstrating that defendants violated "clearly established law" requires not a citation to generalized principles of law, but, rather, specific authority on point which "placed the statutory or constitutional question" confronted by the official "beyond debate." *Id.* Plaintiff has failed to heed this admonition in this case. As quoted previously, plaintiff cites *Jackson* and *Brown v. Jacquith* for the proposition that "a person deemed mentally incompetent where there is no probability that they will regain competence in the foreseeable future, they must either be committed or released, as they are a free ordinary citizen." [*Id.*] Clearly, this authority fails to address the specific, and narrow, factual allegation which even arguably gets past absolute immunity in this case, namely the advice allegedly given to two individuals acting in their capacities as jailers, that they "get on board" with Allgood's prosecutorial strategy not to get in the middle of a dispute between two judges.

There is nothing in the precedent cited by plaintiff regarding the constitutionality of providing advice to jailers regarding a matter of prosecutorial strategy, and there is nothing addressing the unique procedural situation faced by Allgood in this case, namely the state court impasse. While this court has very serious issues with the way in which Allgood prosecuted the case, it strikes it as a legitimate, and significant, mitigating factor in his favor that he attempted

to "do the right thing" legally and institute civil commitment proceedings. Once again, this court believes that Allgood committed a serious error as a prosecutor by not appealing that impasse to the Mississippi Supreme Court, but that decision is clearly covered by absolute prosecutorial immunity and therefore has no place in the qualified immunity analysis.

This court is very much aware of the weaknesses of the "clearly established" prong as a legal standard, and it is sympathetic to the notion that a plaintiff should not be expected to offer authority which matches the facts of a particular case in all its details. In this case, however, it seems clear that the state court impasse is the *sine qua non* without which this lawsuit would not even exist. That is, plaintiff admits that Allgood enjoys absolute prosecutorial immunity for his actions prior to the chancellor issuing his September 20, 2010 order of dismissal, and the events relating to the Clay County Jail all occurred after plaintiff was transferred there following that order.

It thus seems highly likely that, if the chancellor had simply carried out the civil contempt proceedings as ordered by the circuit court judge, then this lawsuit would never have been filed. Under these circumstances, this court does not believe that the state court impasse can reasonably be regarded as a mere detail of this case, but must be considered an essential fact which must be addressed, in some way, by the authority offered to meet the "clearly established" standard. In so concluding, this court is not suggesting that this authority must involve a dispute between two judges, but it does seem fair to require some authority clearly establishing what a prosecutor's duties are if he promptly files a motion for the legally-required civil contempt proceedings, and yet they are not carried out by the responsible state court, for whatever reason. Plaintiff offers no such authority, instead relying upon the case law which he, presumably, would

have relied upon if Allgood had never even sought the civil contempt proceedings in the first place.

Once again, this court does not regard Allgood's strategy of doing nothing for years in response to the impasse as having been the constitutionally correct one, and it will therefore assume that plaintiff should prevail on the first prong of the qualified immunity standard. Fair or not, however, U.S. Supreme Court precedent requires that plaintiffs surmount an additional obstacle by presenting authority "clearly establishing," under circumstances reasonably close to the one faced by the defendant, the unlawfulness of his planned course of action. In the court's view, by failing to submit authority dealing with either advice provided to jail officials, or the proper legal response to a state court's refusal to conduct the required civil contempt proceedings, plaintiff has failed to meet this burden. This court thus concludes that plaintiff has failed to meet the second prong of the qualified immunity standard, and Allgood's motion for summary judgment is therefore due to be granted on the basis of qualified immunity, even in the event that this court erred in finding that he enjoys absolute prosecutorial immunity in this case.

As a final act of judicial housekeeping regarding the claims against Allgood, this court observes that its holding that he enjoys Eleventh Amendment immunity as to all claims against him in his official capacity similarly bars any state law claims asserted under the MTCA. In so stating, this court notes that the Mississippi Tort Claims Act expressly preserves the State's Eleventh Amendment immunity on claims brought in federal court. *See* Miss. Code Ann. § 11–46–5(4). This immunity aside, this court (which would be the trier of fact on any MTCA claims) does not regard any of Allgood's alleged actions in this case as falling within the scope of any state law tort claims, including those which might be asserted against him individually. This court further notes that Allgood has filed a motion to exclude plaintiff's expert witness Willie

33

Abston, who sought to testify regarding the legal standard of care. This court has not considered Abston's opinions in preparing this order, and it finds the motion to strike his testimony to be moot in light of its order today. That motion will therefore be dismissed.

### B. Claims asserted against the Clay County defendants

This court now turns to plaintiff's claims asserted against the Clay County defendants, including former Sheriff Huffman and current Sheriff (and former Deputy) Scott, as well as Clay County itself. In considering these claims, this court's analysis begins with a recent Fifth Circuit decision which casts a long shadow over this case. In *Jauch v. Choctaw Cty.*, 874 F.3d 425, 437 (5th Cir. 2017), the Fifth Circuit determined that a county sheriff was not entitled to qualified immunity where a pretrial detainee waited for 96 days to be brought before a judge and was effectively denied bail. In so holding, the Fifth Circuit wrote that the sheriff "should have known to put his constitutional obligations ahead of his idiosyncratic understanding of state law requirements. He is not entitled to immunity." *Id. Jauch* was decided after the relevant events in this case, and this court will accordingly not consider it in the context of the "clearly established prong" of the qualified immunity standard. Nevertheless, in considering its basic approach to this case, and the liability of Clay County itself, this court cannot ignore the fact that the Fifth Circuit in *Jauch* expressed grave concerns regarding the actions of a Mississippi sheriff and county which resulted in a pretrial incarceration which was of vastly shorter duration than the one in this case.

34

In light of *Jauch*, and the length of the pretrial incarceration in this case, Clay County's

motion for summary judgment simply cannot withstand substantial evidence that constitutional

violations by itself and/or its employees served to unlawfully extend plaintiff's detention.

Unfortunately for the County, not only does such evidence exist, but this court regards it as being

of a potentially quite damaging nature. This court previously mentioned this evidence in its

discussion of the facts, but given its importance, it will repeat it here. In his brief, plaintiff

describes this evidence as follows:

> [K]nowing that Judge Howard had removed Harris' case from the active docket,
> removing its attention from the Court, on October 25, 2010, Allgood, Scott and Huffman
> conspired to further hide Harris from the courts, while justifying their unlawful
> imprisonment, by submitting a declaration to the Court stating that the following as it
> relates to the Capias, "After diligent search and inquiry, I have been unable to
> find the within named Stephen Jesse Harris in my county," signed Sheriff Laddie
> Huffman and Deputy Sheriff Eddie Scott (the "Sheriff's Diligence Declaration"). The
> brazen absurdity of such a diligence declaration was mind boggling given the fact that in
> fact Defendants Huffman and Scott were both well aware that Harris was in their custody
> at that very time.

[Plaintiff's response to Clay County's motion for summary judgment at 10-11].

Thus, the Sheriff's Diligence Declaration consists of a simple assertion that: "[a]fter

diligent search and inquiry, I have been unable to find the within named Stephen J. Harris in my

county. This, 25th day of October, 2010" [Plaintiff's exhibit 21]. The signatories are listed as

Sheriff Laddie Huffman and Deputy Eddie Scott. The Declaration is thus a straight-forward

factual assertion that Huffman and Scott were unable to locate plaintiff during a time when it

seems clear that they knew he was located in their jail. Obviously, the fact that Huffman and/or

Scott would have attested to such facts raises very serious concerns regarding their good faith, or

lack thereof, in this case.

This court was sufficiently concerned by the Sheriff's Diligence Declaration, which was

first raised in a response to a summary judgment motion filed by then-defendant Dr. Miller, that

it, through its staff, e-mailed counsel for the County about it to ensure that it was addressed in its reply brief. As it turns out, the issue was not, in fact, addressed in defendant's reply brief, and this court spent a considerable amount of time preparing an order based on the assumption that the County had not addressed the issue. This court later discovered that the issue had, in fact, been addressed by the County in its briefing, but in its response to *plaintiff*'s motion for summary judgment. This fact resulted in a substantial delay in the preparation of this order.

This court can, and will, overlook the County's filing its explanation for the Sheriff's Diligence Declaration in the wrong brief, but it cannot overlook what is substantively missing in that explanation: namely, record citations in support of the facts asserted. It is a basic principle of summary judgment motion practice that alleged facts which merely consist of "lawyers talking" is not competent summary judgment evidence at all and may not be considered in this court's ruling. Broadly stated, the County's explanation for the Sheriff's Diligence Declaration is that it was somehow consistent or required by local circuit court practice, but, even disregarding the lack of record citations, this court remains rather confused by this assertion. Indeed, this court has never encountered a local court practice which requires false assertions of fact by responsible public officials, and that is what plaintiff, not unreasonably, alleges the Sheriff's Diligence Declaration amounts to. Moreover, the County speculates openly in its response on important matters such as its assertion that "[t]he handwriting on the writ is possibly that of then Chief Deputy Eddie Scott or it could also be the writing of another deputy." [Defendant's response to plaintiff's summary judgment motion at 20].

Thus, even aside from its lack of factual support in the record (which cannot be excused), the County's explanation for the Declaration leaves a number of important unanswered questions. It should be emphasized at this juncture that, even in the qualified immunity context,

this court is required to view summary judgment evidence in the light most favorable to the plaintiff, as the non-moving party. See *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014). Therefore, to the extent that the County itself admits ambiguities in the evidence, these must clearly be resolved in plaintiff's favor on summary judgment. As quoted above, the County's response concedes that then-Deputy Scott may have signed the Declaration, but it relies upon numerous bare assertions of fact with no record citations in support of a conclusion that, if he did sign it, it would have been pursuant to circuit court practice. *Id.* In its submission, the County appears to suggest, without directly saying so or certainly proving it, that circuit court practice in Clay County is to require sheriffs and/or deputies to make factually false declarations that they are unaware of the location of a particular criminal defendant when they are fully aware of his location. *Id.* at 19-20. Once again, the notion that this would be circuit court practice strikes this court as quite suspect, and extraordinary claims require extraordinary proof, and certainly more than bare assertions in a brief.

This court adheres to the quaint notion that, when a Sheriff or his deputy attests that "[a]fter diligent search and inquiry, I have been unable to find the within named Stephen J. Harris in my county," these words should actually mean something in the eyes of the law. Justice may proceed only on truthful assertions, and this court is certainly not prepared to declare these words a nullity on summary judgment, based on unproven and confusing assertions regarding circuit court practice. Indeed, in light of the clarity and evident falsity of the Sheriff's Diligence Declaration, this court regards it as a literal impossibility for the County to have briefed any iteration of its "it was a matter of circuit court practice" theory which would have removed the Declaration as an issue presenting triable fact issues for a jury to decide.

In the court's view, the relevant summary judgment standards are simply too deferential to the plaintiff, and issues such as whether a particular defendant actually signed the Declaration, and, if so, what his subjective motivation in doing so was, are so inherently fact and credibility-intensive, that it could not resolve them in defendant's favor on summary judgment even if it had been confronted with appropriate briefing on these issues. Thus, even if the County had clearly established circuit court practice with competent summary judgment evidence, and even if Scott had submitted an affidavit stating that he had signed the Declaration in accordance with this practice, it would still fall to a jury to decide whether he was being truthful in this regard, or simply making self-serving excuses for signing a plainly false Declaration. Of course, the County did not support its theory with proof of this nature, and this renders the existence of triable fact issues in this regard a very clear matter.

This court will therefore proceed, for the remainder of this order, on the assumption that Huffman and/or Scott did actually make knowingly false representations regarding their knowledge of plaintiff's whereabouts in the Declaration. Why they would have issued a knowingly false Declaration is uncertain, although it believes that plaintiff offers one reasonable theory in this regard. In his brief, plaintiff writes that "[i]n submitting a false Sheriff's Diligence Declaration, Harris would not be brought before a judge who would learn that Harris had already been deemed incompetent by the Competency Order," thus suggesting that Huffman and Scott's intent in issuing the declaration was to hide plaintiff from the courts and keep him in the "black hole" of the Clay County jail indefinitely. [Brief at 11].

This court cannot reject plaintiff's interpretation of the Declaration, but, by the same token, it is fully open to the possibility that it will not withstand scrutiny at trial. Resolving

issues such as this one is the reason that juries and trials exist in the first place, and this court must presently decide only whether plaintiff should be given a chance to make his case at trial. This court notes parenthetically that plaintiff's theory is arguably supported by the fact that, at their depositions, Huffman and Scott cited the capias on the prison assault charge as their basis for keeping plaintiff in their jail even after the chancery court's October 20, 2010 order. Interestingly, this position is not shared by Allgood, who has made clear that he regards plaintiff's incarceration as having been based on the original murder capias and an order from the chancery court, and not the prison assault capias. [Doc. 330-3 at 85-86, 101, 143-44]. As discussed below, this disagreement among the defendants arguably supports plaintiff's theory that the county defendants were seeking to improperly use the prison assault capias as a pretext for continuing to hold plaintiff.

This court was puzzled as to why counsel for plaintiff did not enquire regarding the Declaration during Huffman and Scott's depositions, and thus give them an opportunity to explain it. In response to an e-mail inquiry from this court's staff in this regard, counsel for plaintiff explained that the Declaration was not even discovered until after these depositions, since it was Huffman and Scott's testimony which led them to inquire into the prison assault charge and related capias in the first place. This court regards this as an acceptable explanation as to why this issue arose so late in this case, and it believes that the fact that both defendants sought to use the capias on the assault charge to justify plaintiff's lengthy incarceration in their jail tends to support his theory as to why they would have had an incentive to lie regarding this matter.

It appears to this court that if Huffman and/or Scott wished to use the prison assault charge to justify plaintiff's indefinite incarceration, then it might assist them in doing so if this

charge lingered unresolved for a lengthy period of time. This appears to be exactly what happened, since the parties seem to agree that the assault charge was never resolved one way or the other. Moreover, the fact that, many years later, Huffman and Scott cited the assault capias in their depositions as justification for plaintiff's lengthy incarceration, while Allgood himself did not, arguably dovetails nicely with plaintiff's theory that they were seeking to use the lingering assault charge as a pretext for continuing to hold him. This court notes that this theoretical abuse of due process does not depend upon plaintiff, strictly speaking, having been "hidden" from the relevant courts. Indeed, the County does cite an instance in which plaintiff appeared before the circuit judge in question, and it maintains that this tends to negate the theory that plaintiff was being actively "hidden" from that court. [Brief at 20].

Even if this court is to assume that plaintiff was not, strictly speaking, being "hidden" from the circuit court, it still can envision a very realistic scenario in which the County defendants were seeking to "drag out" the prison assault charge in order to use its lingering and unresolved status as a pretext for plaintiff's lengthy incarceration in their jail. In so stating, this court knows very well that judges are dependent upon parties to move cases along, and it is very possible for cases to fall between the cracks if they fail to do so. This is true even if a party involved is not actually being "hidden" from the court.

This court's unwillingness to dismiss the possibility that Scott and/or Huffman made a knowingly false representation in the Declaration is also informed by the basic plausibility of the notion that they may have been seeking to protect the public by preventing plaintiff's release. In so stating, this court will quote, once again, plaintiff's allegation in his brief that:

> Huffman admitted that he reached out to Dr. McMichael and was frustrated by the fact that the Mississippi Department of Health didn't "have a criminally insane program to house the criminally insane until they get them back to their sanity and get their holding over with." Having come to the conclusion that another commitment hearing would not

> accomplish their goal, which was to try Harris for the crimes alleged against him, Allgood and Huffman were left with few alternatives to keep Harris confined, with the hope that Harris would one day regain his sanity and be tried for the crimes he was charged with.

[Plaintiff's reply brief at 25].

While this court may be deemed by some to have taken the defendant sheriffs to task in this order, it must state for the record, as it did in its discussion of the claims against Allgood, that it actually has considerable sympathy for what it believes to have been a motivating factor for them in this case, namely protecting the public. In so stating, this court will note once again that plaintiff was indicted for truly heinous crimes in this case, and while he enjoys a presumption of innocence on these charges, he has not been acquitted of any of them. This court further reiterates that, if the State of Mississippi has, in fact, failed to spend the necessary money to protect the public from the criminally insane, then this is a highly lamentable fact which can not be attributed to any of the defendants in this case and quite understandably led to frustration on their part.

In the court's view, the fact that a desire on the part of the county defendants to protect the public is so understandable, on a human level, increases the plausibility of the notion that they may have crossed the line into making false statements in an official Declaration in order to accomplish this goal. If that did, in fact, occur, then it constitutes a clear due process violation, regardless of how understandable defendants' motivations might have been. While it seems likely that this sad circumstance would have been prevented had Allgood appealed the state court impasse to the Mississippi Supreme Court, he clearly enjoys absolute immunity for his decision not to do so.

Furthermore, even if the County offers a fully logical and persuasive explanation for the Declaration at trial, the fact will still remain that the plaintiff in this case spent close to six *years*

41

in the Clay County Jail without trial following the chancery court's 2010 order. Once again, the Fifth Circuit in *Jauch* denied qualified immunity and other summary motions involving an incarceration of a mere 96 days. That being the case, it is difficult for this court to discern why Choctaw County would have been required to face trial in *Jauch* and yet the Clay County defendants would not in this case. Accordingly, while this court believes that the unanswered questions surrounding the Sheriff's Diligence Declaration are very serious ones which warrant a full examination at trial, it is by no means the only issue that the County should have to answer for before a jury.

Ultimately, the most important consideration for this court, as it relates to the County's liability, arises from the several years which it allowed plaintiff to sit in its jail without any efforts to clarify his status with a court. In reading Huffman and Scott's depositions, this court is struck by an evident belief on their part that clarifying the status of an inmate being held indefinitely in their jail with no conviction and no due process provided was someone else's problem. Indeed, Huffman testified that:

> Q: Okay. So your position is that you can hold someone indefinitely if you didn't get an order to release them?
> Huffman: It's my position that I release folks that the court ordered to be released that have made bond.

[Depo. at 35].

> Q: So are you aware of the concept that such a pretrial detainee that we just described cannot be held indefinitely?
> Huffman: Never crossed my mind.

[*Id.* at 34].

This court considers it rather remarkable that Huffman could observe plaintiff sitting in his jail for several years with no prospect of trial and not even have it "cross his mind" that he might have a legal obligation to do something to clarify his status. It strikes this court that,

considering that prosecutors and judges have absolute immunity for their actions in performing their official duties, it is essential that *someone* involved in the unlawful detention of citizens in this state face a real prospect that they might have to explain their actions to a jury some day. Otherwise, there is, as best this court can tell, little to prevent the responsible parties from knowingly violating the due process rights of their inmates. *Jauch* suggests that the Fifth Circuit agrees with this notion, and the decision makes it clear that Mississippi counties and sheriffs are, in fact, potentially liable if they demonstrate disregard for protecting the constitutional rights of those in their custody.

In writing the above words, this court is by no means suggesting that, merely because prosecutors and judges generally enjoy absolute immunity for their actions, Mississippi counties must inevitably serve as "scapegoats" in cases of this nature. To the contrary, this court believes that there are steps which the County could have very realistically taken in this case which would, at least in its mind, have insulated it from potential liability. In so stating, this court is certain that the County has its own attorney who (unlike its former DA, apparently) is concerned with protecting it from civil liability. In the court's view, the Clay County Sheriff could, and should, have gone to that attorney for advice on plaintiff's incarceration, and, if he had done so, then even a cursory review of the law in this context would have raised grave concerns in that counsel's mind that plaintiff's constitutional rights were being violated. In that scenario, the County's attorney could have contacted the circuit and chancery court judges involved in the impasse and raised concerns that plaintiff's constitutional rights were being violated by his indefinite incarceration with no apparent prospects of either a trial or civil commitment proceedings being held.

This court strongly suspects that, if the County had taken this action, then this would have been sufficient to get things moving in circuit and/or chancery court. If that proved not to be the case, however, then the County could have filed an emergency appeal to the Mississippi Supreme Court seeking to order one of the courts involved to take action in this matter. Even if, for whatever reason, neither of these steps were sufficient to resolve this matter and plaintiff remained in jail, then this court would be hard pressed to place the blame upon the County in this matter. If the County had shown good faith in this regard, then this court would likewise be much less willing to interpret the Sheriff's Diligence Declaration as potentially being part of an effort to violate plaintiff's constitutional rights. In reality, however, not only did the County take no such steps; its final policymaker testified that doing so "never crossed his mind." This court believes that *Jauch* was intended to serve as a message to Mississippi counties that their obligations in this regard *should* cross their mind, and this court's order today is partially intended to serve as a reminder in this regard.

As discussed above, this court's core holding on the qualified immunity issue is that genuine fact issues arising from the Sheriff's Diligence Declaration preclude summary judgment,[4] but it is also necessary to discuss some of the more technical qualified immunity issues in this case. The one qualified immunity issue which this court believes requires some additional elaboration relates to the question of whether plaintiff has sufficiently established that

---

[4] This holding raises questions in this court's mind whether an immediate appeal could properly be filed from its denial of qualified immunity in this order, as is generally allowed. In so stating, this court notes that the Fifth Circuit does "not have jurisdiction to review the genuineness of any factual disputes," it does, however, have "jurisdiction to review the materiality of disputed facts as well as the district court's legal analysis as it pertains to qualified immunity." *Cutler v. Stephen F. Austin State Univ.*, 767 F. 3d 462, 468 (5th Cir. 2014). If Huffman and/or Scott choose to immediately appeal this court's order today, then it will fall to the Fifth Circuit to decide to what extent, if any, it has appellate jurisdiction over such an appeal, and this court will comment on this issue no further.

"clearly established law" put Huffman and Scott on notice that their actions were unlawful, if plaintiff's version of the facts is assumed to be true. While plaintiff cites *Jauch* in this context, this court regards this as improper, since 2017 authority that was decided after the events in this case had already occurred cannot serve to have "clearly established" the law in this context for defendants. Moreover, while plaintiff does cite the previously-discussed generalized authority regarding the rights of mentally ill defendants, there is at least some question in this court's mind whether this authority is sufficiently on point in this case to meet the stringent requirements of the "clearly established" prong.

While plaintiff's submissions on the "clearly established" prong thus leave a good deal to be desired, it should be emphasized that *Tolan* makes clear that the facts must be considered in the light most favorable to plaintiff on summary judgment, even as to this stringent prong. In this case, that means that this court must consider the law as it relates to a (presumed) knowing and deliberate lie by Huffman and Scott in submitting the Sheriff's Diligence Declaration, in order to deprive him of his due process rights under *Jackson*. Considering the facts of this case, this court regards it as a proper one for the application of the "obvious case" exception to the "clearly established law" prong, which was first recognized by the U.S. Supreme Court in *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

In *Hope*, the Supreme Court considered an Eighth Amendment claim in a case where prison guards handcuffed a prisoner to a hitching post on two occasions, one of which lasted for seven hours without regular water or bathroom breaks. Among other facts, the Supreme Court noted that "[a]t one point, a guard taunted him about his thirst." *Hope*, 536 U.S. at 738, 122 S. Ct. 2508. Faced with these facts, six Supreme Court Justices concluded that the Eleventh Circuit erred in concluding that the defense of qualified immunity was available to the defendants. In so

concluding, the Court observed that "[a]s the facts are alleged by Hope, the Eighth Amendment violations [are] obvious." *Id.* The Supreme Court reached this conclusion in spite of the fact that the plaintiff was unable to demonstrate federal appellate authority clearly establishing that it was unlawful to tie a prisoner to a hitching post. *Id.*

In subsequent decisions, the Supreme Court has explained *Hope* as standing for the proposition that a failure to cite federal appellate authority supporting a claim may be excused in cases where the constitutional violation is "obvious." In the 2004 decision of *Brosseau v. Haugen*, for example, the Supreme Court wrote that:

> Of course, in an obvious case, these standards can "clearly establish" the answer, even without a body of relevant case law. *See Hope v. Pelzer*, 536 U.S. 730, 738, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially similar case for the right to be clearly established).

*Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).

The *Hope* exception is not frequently applied, presumably because most cases are not "obvious" ones. This court nevertheless considers *Hope* to be a highly important exception to the exceedingly stringent showing of prior precedent which applies in most qualified immunity cases. Indeed, if this exception did not exist, then defendants might feel at liberty to engage in a wide variety of obviously unconstitutional conduct which had not yet been declared unlawful by a "robust consensus" of federal appellate authority. *See Taylor v. Barkes*, 135 S. Ct. 2042, 2044, 192 L.Ed.2d 78 (2015), *quoting City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1779 (2015). It also seems clear that there must be some mechanism for plaintiffs to "break through" the general requirement of prior precedent, lest the law end up essentially frozen in place, with little potential for development based on novel fact patterns or evolving law enforcement practices.

This court believes that any jurist would be hard-pressed to defend the contrary position, namely that obvious constitutional violations *should* be excused merely because federal appellate courts had not issued a "robust consensus" of cases concluding that the conduct in question was unlawful. This may be why the Supreme Court stated in *Brosseau* that "[o]f course" a "body of relevant case law" is not required in "obvious cases," as if the matter were self-evident. *Brosseau*, 543 U.S. at 199, 125 S.Ct. 596. This court believes that *Hope*'s logic is, in fact, self-evident, and it will apply that logic in this case and therefore conclude that the "clearly established" prong is met in this case.

Having addressed the qualified immunity motions relating to the claims against Huffman and Scott in their individual capacities, this court now turns to the claims against them in their official capacity, which represent claims against Clay County itself. In addressing these claims, this court observes that plaintiff is fortunate in that both Huffman and Scott served, at one time or another during this lawsuit, as Sheriff of Clay County, which provides him with a completely separate avenue for recovery in this case, even if the stringent qualified immunity standards prevent him from recovering against Huffman and/or Scott in their individual capacities.

In its briefing, Clay County relies upon the familiar *Monell* doctrine's requirement that, to hold a municipality liable under § 1983, it or its employees must be demonstrated to have acted pursuant to a municipal "policy or custom." *Monell v. New York City Dept. of Soc. Serv.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2036 (1978). The *Monell* doctrine is, in this court's experience, an often impenetrable defense in § 1983 cases, since plaintiffs are generally unable to prove that a particular constitutional violation occurred pursuant to a municipal policy or custom. This court believes this to be the case here as well, since plaintiff offers insufficient proof regarding any of the potential (and difficult) avenues for establishing municipal liability

with one important exception. This exception is the "final policymaker" doctrine, which is, in this court's experience, the one avenue for establishing municipal liability which plaintiffs are frequently able to surmount. It is well established that "[a] single decision may create municipal liability if that decision [is] made by a final policymaker responsible for that activity," *see Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005), and the Fifth Circuit has held that "[s]heriffs in Mississippi are final policymakers with respect to all law enforcement decisions made within their counties." *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir. 1996).

In the court's view, plaintiff has potentially strong evidence that Huffman and/or Scott subjected Clay County to liability under *Monell* for their actions while serving as "final policymaker" during their tenures as Sheriff, and *Jauch* constitutes particularly strong authority for plaintiff on this issue. While, as discussed previously, *Jauch* may not serve as relevant authority under the "clearly established" prong of the qualified immunity standard for the claims against Huffman and Scott individually, it represents strong authority for plaintiff on his claims against them in their official capacity, that is on his claims against Clay County.

In reversing the district court's conclusion that Choctaw County faced no liability under *Monell*, the Fifth Circuit wrote in *Jauch* that:

> The district court found that Choctaw County was not liable under *Monell*. It erred. Jauch challenges the indefinite detention procedure. Accordingly, the first and second elements of our inquiry reduce to one question: Is the challenged procedure "an official policy" that was "promulgated by the municipal policymaker?" *Hicks-Fields v. Harris Cnty., Texas*, 860 F.3d 803, 808 (5th Cir. 2017) (*quoting Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009)). It is. There is no dispute that Sheriff Halford is the relevant policymaker. *See Brooks,* 84 F.3d at 165 ("Sheriffs in Mississippi are final policymakers with respect to all law enforcement decisions made within their counties."). And, both prior to and during this litigation, Sheriff Halford and Choctaw County have cleaved to the indefinite detention procedure.

*Jauch*, 874 F.3d at 435.

In its brief, Clay County denies that there is a factual basis for finding any constitutional violations by its policymaker(s), writing that:

> Plaintiff has no facts that a policymaker personally directed Clay employees to engage in an alleged unconstitutional violation. There is no evidence that a policymaker acquiesced in any alleged unconstitutional conduct as required by the second criterion under *Monell*. There is no evidence of any county custom or policy, or any wrongful conduct by the Clay defendants whatsoever.

[Clay County's brief at 17]. This court disagrees, based partly upon the previously-discussed evidence relating to the Sheriff's Diligence Declaration. While Huffman and Scott's precise intent in issuing the Declaration is a question for a jury to decide, it seems clear that one *potential* interpretation is that it represented evidence of an intent on the part of one or both of these individuals to deprive plaintiff of his due process rights and keep him locked up for years in the Clay County jail, without attracting the notice of the courts. Indeed, the Sheriff's Diligence Declaration strikes this court as stronger evidence against the Sheriffs in this case than anything which the Fifth Circuit confronted in *Jauch*, and Harris's time of incarceration in this case was far longer than that of the plaintiff in *Jauch*.

This court therefore has little difficulty in concluding, based on *Jauch*, that genuine issues of material fact exist regarding Clay County's liability in this case. At the same time, this court reiterates that there remain many unanswered questions regarding the Sheriff's Diligence Declaration in its mind, and it looks forward to seeing them clarified at trial. While this court thus views plaintiff's claims against the County as potentially strong ones, it should be emphasized that Scott was (unlike Huffman) only Deputy at the time he may have signed the Sheriff's Diligence Declaration, so his actions in signing it alone may not be imputed to the County. Nevertheless, this court believes that a jury may reasonably consider the Sheriff's Diligence Declaration as evidence regarding Scott's state of mind *vis a vis* providing plaintiff

with his constitutional rights, and this may make jurors more likely to conclude that Scott's actions after he did become Sheriff were evidence of knowing constitutional violations for which the County should be held liable.

This court now turns to plaintiff's separate claim arising out of his alleged forced medication, which he asserts against former Sheriff Huffman. As with the other claims against him, Huffman faces individual liability as to which he has raised a qualified immunity defense, and it appears to this court that his role as final policymaker also gives rise to the possibility that the County will be held liable for his actions. In the court's view, the very different summary judgment standards relating to individual and official-capacity constitutional claims require a different result as to the two forms of actions against Huffman on the forced medication claim. As discussed previously, the qualified immunity standards places the burden upon the plaintiff to do the "heavy lifting" at the summary judgment stage as to the claim against Huffman individually, which includes a duty of providing authority "clearly establishing" that the alleged actions were unlawful at the time he took them. By contrast, the official capacity claim against Huffman, which is effectively a claim against the County itself, does not require the plaintiff to carry such a heavy burden at the summary judgment stage, and this court has greater discretion to await the evidence at trial before ruling on the claim at the directed verdict stage.

There are several factors which lead this court to conclude that it should await the evidence at trial before deciding whether to submit a forced medication claim to the jury on the official capacity claims against Huffman. First, this court has previously noted its grave concern regarding the Sheriff's Diligence Declaration, which raises serious questions in its mind regarding this defendant's good faith *vis a vis* plaintiff. Second, Clay County will be a defendant at trial on plaintiff's unlawful incarceration claim regardless of this court's ruling on the forced

medication claim, and, during that trial, this court intends to allow plaintiff to elicit testimony on all aspects of his incarceration at the Clay County jail. This includes the alleged incident of forced medication, during which, plaintiff asserts, Sheriff Huffman personally held him down while medical personnel medicated him against his will.

In light of the foregoing, this court can see no compelling reason not to await the evidence at trial before deciding whether a forced medication claim against the County has potential merit, since it will be a defendant at trial regardless, and the jury will hear evidence regarding the incident in question regardless. This court will therefore not rule on the official capacity forced medication claims against Sheriff Huffman at this juncture, and it will decide at the directed verdict stage of trial whether to submit this claim to the jury.

A different result is required as to the individual capacity claims against Huffman, as to which plaintiff is required to surmount a much more difficult burden on summary judgment, most notably the "clearly established" prong of the qualified immunity standard. As noted previously, Huffman argues that he was merely acting pursuant to orders from medical professionals and that plaintiff's forced medication was reasonable under the circumstances. Specifically, Huffman argues that "Harris' attempt to place responsibility on [Huffman] for a single forced administration of anti-psychotic medication is unavailing since the order for such administration came from a medical doctor after Harris assaulted jail personnel and thus was medically necessary under the circumstances." [Huffman brief at 1]. As discussed below, this court regards these two factors – plaintiff's alleged prior history of violence at the jail (and outside of it) and the fact that the forced treatment was ordered by medical professionals – as very significant mitigating ones in Huffman's favor which, in turn, require a showing of

authority by plaintiff which "clearly established" that his actions were unlawful even under these circumstances.

The one incident of alleged forced medication in this case occurred in 2012, and this court therefore regards it as highly significant that, that same year, the Fifth Circuit issued an opinion in which it found the law surrounding the forced medication of prisoners to be unclear. Specifically, in *Sama v. Hannigan*, the Fifth Circuit wrote that:

> In sum, the law governing Fourteenth Amendment claims involving unwanted medical treatment in the prison context is far from certain. Given the dearth of case law and the existence of at least some case law supporting the position that Hannigan's and Benoit's conduct was not contrary to clearly established law, Sama has failed to rebut the defendants' entitlement to qualified immunity on her Fourteenth Amendment claim, and summary judgment was appropriate.

*Sama v. Hannigan*, 669 F.3d 585, 595 (5th Cir. 2012). The Fifth Circuit in *Sama* thus affirmed the dismissal of forced medication claims in the prison context based on a conclusion that the requirements of the Fourteenth Amendment in this context were not "clearly established." This court notes that, four years later, Judge Bramlette wrote that "the Fifth Circuit has not clearly delineated the bounds of an inmate's right to refuse medical treatment," *see Howard v. Saucier*, 2016 WL 1068740, at *2 (S.D. Miss. Jan. 20, 2016), report and recommendation accepted, 2016 WL 1069095 (S.D. Miss. Mar. 17, 2016), and it thus appears that the law in this regard remained unclear even then.

In this case, plaintiff has failed to offer authority "clearly establishing" the law in this context during the relevant events in 2012, and it appears from the above authority that this was not a result of negligence on the part of his counsel but merely reflects that the law in this context was not, in fact, clearly established at this time. It appears to this court that this may still be the case today, but, in any event, the question in the qualified immunity context is regarding the law in 2012, since that is the time period in which Huffman allegedly participated in

52

plaintiff's forced medication. This court therefore regards *Sama* as important authority in support of Huffman's qualified immunity motion in this case.

As noted previously, the above-mentioned mitigating factors in Huffman's favor make plaintiff's burden of surviving a qualified immunity defense that much more difficult, above and beyond the general lack of clarity regarding the law in this context. Indeed, plaintiff does not deny that he committed a violent assault in the Clay County Jail in 2010, and this is, in the court's view, a significant factor in favor of Huffman's qualified immunity motion. In so stating, this court notes that the Fourteenth Amendment right to control one's medical care is based upon the notion that an individual has a right to determine what medications are put into his own body. In cases where an individual takes it upon himself to violently attack someone else in jail, however, then jail officials are not simply faced with the question of what the violent prisoner would prefer to do with his own body. They must, rather, also concern themselves with ensuring the safety of fellow prisoners.

This court believes that, in seeking to protect inmates and employees at the jail, Huffman could also have reasonably considered the fact that plaintiff is a seriously mentally ill individual who was indicted for murder and other heinous crimes. This court therefore believes that there was very reasonable cause for Huffman to fear that plaintiff might commit serious acts of violence at the jail. It is in this factual context which plaintiff must "clearly establish" that Huffman's actions were unconstitutional under then-existing precedent, and he has failed to meet this difficult burden.

In his response to the County's motion for summary judgment, plaintiff fails to respond to its citation of *Washington v. Harper*, 494 U.S. 210, 227 (1990), for the proposition that "[w]e hold that, given the requirements of the prison environment, the Due Process Clause permits the

53

State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Harper*'s inquiry into whether "the treatment is in the inmate's medical interest" further highlights the importance of the second mitigating factor in Harper's favor, namely the fact that plaintiff himself alleges that Dr. Miller and Nurse West ordered the forced medication of which he complains in this case. Indeed, plaintiff himself writes in his brief that:

> Sometime in or around January 2012, Defendant West approached Dr. Miller about Harris, a schizophrenic, whom she believed had not been taking antipsychotic medications for some time prior to her employment, and being aware that Harris had been refusing to take the oral medications provided.

> In or around late January 2012, although, Dr. Miller never personally examined Harris, he prescribed to Harris Prolixin, a new antipsychotic medication that Harris had never previously taken, to be administer by injection. On or around January 27, 2012, Defendant Miller instructed West to administer the Prolixin to Harris.

> On or around February 6, 2012, Defendants West and Huffman attempted to administer the Prolixin to Harris, and in response Harris refused. Following those threats, West then administered the Prolixin in Harris' arm against his will.

> Following this physical ordeal, and as a result of the threats issued to him by the jailer, Harris consented to the continued administration of the antipsychotic medication under duress. Defendant West was aware that forcibly administering antipsychotics drugs against a patient's will, was improper. However, despite this understanding she participated in the February 6, 2012 act any way.

[Plaintiff's brief at 11-12].

While plaintiff thus appears to allege that Dr. Miller and Nurse West had the most prominent role in allegedly medicating him against his will, he does allege that Huffman personally held him down to receive the medication. Specifically, plaintiff contends in his brief that "[a]fter Harris refused, Huffman caused Harris to be restrained by handcuffs, and held down by several jailers, including Huffman who had placed his hands around Harris' neck. Harris

54

continued to refuse and was threatened by a female jailer that if he did not accept the shot, they would put the medicine in his food." *Id.* at 12.

As discussed previously, this court will allow testimony regarding this incident at trial, and it will reach a decision on the official capacity claims against Huffman after viewing that evidence and hearing renewed legal arguments from counsel. In order to survive a qualified immunity motion as to the claims against Huffman individually, however, a plaintiff must "clearly establish" relevant precedent at the summary judgment stage, and he has failed to do so in this case. This court will therefore grant Huffman's qualified immunity motion as to the forced medication claim against him in his individual capacity. As to the official capacity claim against Huffman (i.e. against Clay County itself) this court will, once again, await the evidence at trial and determine at the directed verdict stage whether to allow the jury to resolve this claim. In order to survive a directed verdict motion in this context, plaintiff would be well advised to be armed with authority which supports a conclusion that Huffman violated the Fourteenth Amendment even under the mitigating circumstances discussed above.

At this juncture, this court wishes to emphasize that, while plaintiff asserts a number of legal theories in this case, it seems clear that the correct legal "tool for the job" in this case is the 14th Amendment due process clause. Certainly, neither the Fourth Amendment prohibition on unlawful searches and seizures nor the Eighth Amendment prohibition on post-conviction cruel and unusual punishments seem applicable here, and neither side argues otherwise. The parties do disagree on how plaintiff should be characterized in this case, with defendants arguing that he should be regarded as a "pretrial detainee" under relevant 14th Amendment case law, while plaintiff suggests that he should be considered a "free man." Notably, however, plaintiff offers this court no authority suggesting what specific standards apply to the treatment of supposedly

"free men" who, objectively speaking, find themselves locked up in a county jail, and, until he does so, this court will assume that the normal Fourteenth Amendment due process standards for pretrial detainees apply in this context. The exact nature of the Fourteenth Amendment jury instructions in this case does not need to be determined until that phase of trial, but this court deems it important to emphasize that this amendment will, in fact, serve as the basis for the claims in this case.

In his complaint, plaintiff asserts a number of additional legal theories which, in this court's view, do not withstand legal scrutiny. For example, plaintiff appears to assert a "false imprisonment" claim, but, in support of it, he cites *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980), which dealt with the common law of Texas, not Mississippi. In this state, the tort liability of a county is determined by reference to the Mississippi Tort Claims Act (MTCA), with its many exceptions and procedural requirements. The MTCA provides that "no [government] employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties." Miss. Code Ann. § 11–46–7(2). Plaintiff alleges that the events in this case occurred during the course of scope of Huffman and Scott's official duties, and this court will therefore assume that the MTCA's provisions apply. This court would be the trier of fact in any MTCA action against the County, and it therefore seems proper to note its initial impressions regarding any such claims. *See* Miss. Code Ann. § 11-46-13(1)("The judge of the appropriate court shall hear and determine, without a jury, any suit filed under the provisions of this chapter.").

This court notes that the Mississippi Supreme Court rejected a false imprisonment claim against a county based on the MTCA's exception to state liability for actions by prisoners. *See*

Miss Code Ann. § 11-46-9(1)(m). Specifically, the Supreme Court wrote in the 2016 decision of

*Hinds County v. Burton* that:

> Without addressing immunity, the trial court found that Hinds County falsely imprisoned Burton in its Raymond Detention Facility. It is undisputed that JPD officers arrested Burton, and that no Hinds County employee was involved in the arrest. It also is undisputed that the false-imprisonment claims against Hinds County all stem from the time Burton was at the Raymond Detention Facility.
>
> Hinds County argues that Burton's false-imprisonment claims against it arose when Burton was an inmate, and therefore it is entitled to immunity under Section 11–46–9(1)(m), which provides immunity from the claims "[o]f any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution...." Miss.Code Ann. § 11–46–9(1)(m) (Rev. 2012). While the MTCA does not define "inmate," this Court has defined the term broadly, to include pretrial detainees, such as Burton. *See, e.g., Liggans v. Coahoma Cty. Sheriff's Dep't,* 823 So.2d 1152, 1156 (Miss. 2002).
>
> Burton's only argument on appeal is that his claim accrued before he was detained but after he was "accepted" by Hinds County at its Raymond Detention Center. Burton's position is essentially that his claims arose at a time when he was not an inmate but was in the process of being booked. We previously have rejected a similar argument. *See Love v. Sunflower Cty. Sheriff's Dep't,* 860 So.2d 797, 800 (Miss.2003) (holding that plaintiff in the process of bonding out was an "inmate," notwithstanding plaintiff's claim that he was a "civilian detainee in the process of being released."). As it relates to false-imprisonment claims against Hinds County, we find that Burton is a "claimant who at the time the claim ar[ose][wa]s an inmate." Miss.Code Ann. § 11–46–9(1)(m). Therefore, Hinds County is immune and the trial court erred by not dismissing those claims.

*Hinds Cty. v. Burton*, 187 So. 3d 1016, 1024 (Miss. 2016)

It appears that, given that the Mississippi Supreme Court has broadly interpreted § 11-46-9(1)(m)'s prohibition against state or municipal liability for actions by "inmates," this prohibits any state law claims against the County in this case. Plaintiff should be prepared to rebut this authority if he wishes for this court to enter a MTCA verdict in his favor on any state law claim against the County which arose while he was locked up in the county jail. This appears to be an instance in which Mississippi state law is considerably less generous to former inmates than the law of Texas, and plaintiff's citation to *Douthit* does not advance his position in this case.

Section 11-46-9(1)(m)'s prohibition aside, this court reiterates that the Fourteenth Amendment's due process clause appears to represent the correct legal context in which to analyze the liability issues in this case, and it would therefore be disinclined to find that a state law cause of action such as false imprisonment would be the correct legal theory here. In so stating, this court notes that this is not a case in which a county sheriff simply "picked up a plaintiff off the streets" on his own initiative, but, rather involves a more ambiguous situation arising from the impasse in state court. Plaintiff maintains that the chancery court's October 20, 2010 order dismissing the civil contempt proceedings in that court and transferring the case to circuit court meant that he was due to be released immediately, but this court regards this as being very much open to question.

In his deposition, Huffman testified that he moved plaintiff to his jail because the chancery court order made no provision either way regarding his incarceration status, and he was awaiting word from the circuit judge, to whom the case was being transferred, regarding his status. Specifically, Huffman testified that he interpreted the chancery court's order as giving him the "responsibility to keep him in custody until the circuit judge ordered him released." [Huffman depo. at 79]. Regardless whether a jury finds these arguments valid in a Fourteenth Amendment context, this court does not regard them as fitting within the substantive scope of a state law false imprisonment claim, even disregarding § 11-46-9(1)(m)'s prohibition. This court will therefore almost certainly not be awarding plaintiff any recovery in this regard, in its role as trier of fact over any MTCA claims.

Another legal theory offered by plaintiff which appears inapplicable in this case is his claim asserting a violation of the Thirteenth Amendment's abolition of slavery. In support of this claim, plaintiff argues in his brief as follows:

The Thirteenth Amendment States that neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction. "A slave is a person who is wholly subject to the will of another, one who has no freedom of action and whose person and services are wholly under the control of another, and who is in a state of compulsory service to another." *United States v. Booker*, 655 F. 2d 562, 566 (4th Cir. 1981). "The availability of escape, as the history of slavery has shown, or even a situation where the discipline of terror is not constantly enforced, does not preclude a finding that persons are held as slaves."

Here, having established that Harris was a free man, Plaintiff could not escape Clay County jail, and if he had attempted to do so he would have been met with great bodily injury or even death. As set forth above, Harris had no free will whatsoever, as he was unable to enter and leave the facility on his own volition, he was locked behind bars most of the day, he was prevented from any interaction with the outside world, he was prevented from seeking medical treatment when he desired, and he was subjected to chemical restraints by force, threat and coercion. Further, in order to avoid the torture of sitting in his cell, jailers were able to coerce Harris to engage in free labor, including cleaning the common areas, washing clothes and passing out food trays.

[Brief at 33].

For its part, Clay County denies that plaintiff was forced to do work involuntarily,

arguing that:

Harris claims he was forced to work in violation of the Thirteenth Amendment as an unpaid involuntary laborer and that this labor was forced in order to create evidence that he was competent to stand trial. Harris washed clothes, mopped his cell area, and handed out food trays. Every witness described these activities as volunteer. Correctional Officer Frank Randle testified these were all volunteer work activities. The corrections experts reported that these activities were "good" for Harris. There is no evidence of involuntary work by Harris. Policies prohibiting involuntary work were followed.

[Defendant's brief at 35].

Importantly, the County does not dispute that it would, in fact, have been a violation of

the Thirteenth Amendment for it to have forced plaintiff to work in jail against his will prior to

conviction. Moreover, this court notes that there is precedent for liability in this context. In

*McGarry v. Pallito*, for example, the Second Circuit Court of Appeals wrote that:

Because the Thirteenth Amendment "denounces a status or condition, irrespective of the manner or authority by which it is created," *Clyatt v. United States*, 197 U.S. 207, 216, 25 S. Ct. 429, 49 L .Ed. 726 (1905), institutions housing pretrial detainees are not exempt

from the Amendment's scope. McGarry was not "duly convicted," U.S. Const. amend. XIII, and therefore does not fall within the category of persons to whom the Amendment, on its face, does not apply. Of course, persons sometimes may be detained in advance of securing a conviction. *See United States v. Salerno*, 481 U.S. 739, 741, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). On entering state custody, pretrial detainees surrender "[m]any of the liberties and privileges enjoyed by other citizens" even though they are still clothed in the presumption of innocence. *See Overton v. Bazzetta*, 539 U.S. 126, 131, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). However, although a state may subject a pretrial detainee to restrictions and conditions of the detention facility, such conditions may not violate the Constitution. *See Bell v. Wolfish*, 441 U.S. 520, 533, 536–37, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Pretrial detainees are not outside the ambit of the Thirteenth Amendment's involuntary servitude provision. … McGarry's allegations state a claim under the Thirteenth Amendment. He alleges that his work in the prison laundry was compelled and maintained by the use and threatened use of physical and legal coercion. He supports his allegations with well-pleaded facts that the defendants threatened to send him to "the hole" if he refused to work and that he would thereby be subjected to 23 hour-per-day administrative confinement and shackles. These allegations plausibly allege "threat of physical restraint or physical injury' within the meaning of *United States v. Kozminski*, 487 U.S. 931, 952, 108 S. Ct. 2751 (1988)."

*McGarry v. Pallito*, 687 F.3d 505, 511 (2d Cir. 2012). The Second Circuit in *McGarry* thus held that the plaintiff's Thirteenth Amendment claim had potential merit, and this court found no citing decisions which take issue with the opinion's rationale. Moreover, given that the parties appear to agree that forcing plaintiff to work against his will prior to conviction would, in fact, have violated the Thirteenth Amendment, this appears to represent purely a disagreement regarding what actually took place in this case.

While plaintiff nominally argues that he was "forced" to work in this case, a closer review of his own arguments casts doubt upon this characterization. In his brief, plaintiff writes that the "coercion" which compelled him to work was that, if he did not do so, he would be imprisoned in his cell. Specifically, plaintiff writes that:

As Defendant Sheriff Scott described, for the price of humanity, Harris was coerced into performing unpaid work duties to simply avoid the torture of staring at four walls all day, unable to leave the facility:
**A.** Well, each inmate is expected to keep their cell in order and to wear clean clothes, shower for Court appearances. So, you know, just general rules of life that you expect inmates to follow. And, for example, as far as duties, we do routine maintenance on the

cells up there. So the Jail Administrator may ask, "Hey we've got to paint your cell. Do you want to help paint? Do you want to help clean it or clean the floors?", or whatever. And most of the time these guys are going to volunteer, again because it gives them something to do besides sitting on the bed and looking at four walls.

**Q.** And they don't -- they don't get paid to do and of this janitorial work or passing out food trays or what have you. Correct.

A. Again, I don't necessarily need them. I mean, I've got a -- I've got a maintenance staff that can do all that work. Again, this is just us giving opportunities for them, you know, to be able to have something meaningful to do.

Q. Sure. But they do not get paid, though, correct?

A. They do not.

As best summed up by Jailor Randle:

Q. And as a free man one day, let's just say Sheriff Scott, they decided that they weren't going to let you leave the jail. Okay? And you were working in the jail mopping the floor, passing out food trays and sweeping the area. Okay? How would you feel about that? And you're not getting paid. How would you feel about that?

A. Not good.

Q. And you would agree in your opinion that would constitute slavery, wouldn't it?

A. Probably, yes.

On that basis, Harris was wholly subject to the will of the Clay County Sheriff, he had no freedom of action and his person and services are wholly under the control of the Clay County Sheriff, and who worked without compensation for years, in order to avoid the punishment of staring at the "four walls" in his cell.

Thus, the Court must find that Defendants, violated Harris' Thirteenth Amendment Right, as a state actor confined a free man against his will, and coerced him in free labor by offering an opportunity to avoid the torture of staring at a wall and having the opportunity to do something meaningful, all freedoms that were stripped from Harris during his unlawful confinement.

[Brief at 34-35].

Based on the foregoing, it appears that plaintiff's allegations of "coercion" are simply

that, if he *chose* not to work, he would be locked up in his cell with "nothing meaningful to do."

While this court does not minimize the stress and despair associated with being incarcerated in

jail, these hardships strike it as being "baked into the cake" of being a pretrial detainee held

against one's will. As quoted above, the Second Circuit in *McGarry* was faced with coercion

which took the form of threats to "to send [the prisoner] to 'the hole' if he refused to work and

that he would thereby be subjected to twenty-three hour-per-day administrative confinement and

shackles." *Id.* The Second Circuit found that "[t]hese allegations plausibly allege "threat of

physical restraint or physical injury' within the meaning of *United States v. Kozminski*, 487 U.S. 931, 952, 108 S. Ct. 2751 (1988)."

This court notes that, in *Kozminski*, the Supreme Court defined involuntary servitude as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Id.* It thus appears that, in order to qualify as "coercion" under *Kozminski*, the relevant conduct must involve some sort of negative consequences which are imposed on an inmate if he chooses not to work, not simply the ordinary jail conditions faced by all inmates. The alleged coercion described by plaintiff in this case, by contrast, appears to be that inmates who wished to get outside and "avoid staring at the walls" of their jail could choose to work if they wished to do so. This court does not regard this as "coercion" within the meaning of *Kozminski*, and defendants' motion for summary judgment on this claim will therefore be granted.

Another cause of action raised by plaintiff which this court finds to lack merit is his Americans With Disabilities Act (ADA) claim. In its prior order, this court raised the possibility that an ADA claim might be applicable in this case, but, now that the parties have conducted discovery and it is clear exactly what plaintiff's factual allegations are, it seems clear that this is not the case. In so stating, this court notes that plaintiff seeks to use the ADA as a "backup" cause of action of sorts on virtually all of his allegations in this case. Indeed, plaintiff even attempts to shoehorn his Thirteenth Amendment cause of action, discussed above, into a potential ADA claim, writing that:

> Furthermore, as it relates jail labor, the Clay County Jail cannot compel a pretrial detainee to engage in forced labor, without that detainee's consent, let alone a person who is neither a pretrial detainee nor prisoner. Such an act constitutes involuntary servitude. Here, it has been established that Harris did not have an opportunity to give informed

> consent or refuse to engage in "institutional needs" labor of any kind, whether it be janitorial services, kitchen duties, or any other forms of in-house jail labor that may be performed by detainees on a volunteer basis, as he was a mentally disabled free man trapped in a county jail, and was only afforded a less torturous experience of free labor in order to avoid the relegation of "staring at four walls" for indefinite periods of time.

[Brief at 46].

This court regards the Thirteenth Amendment, and not the ADA, as constituting the proper legal context in which to consider plaintiff's forced labor arguments, and the fact that he seeks to use the ADA as a "backup" cause of action in this regard is typical of his attempts to re-characterize each of his factual allegations as a possible ADA claim. Indeed, plaintiff even attempts to characterize his forced medication claim as an ADA claim, but this court views the U.S. Supreme Court's Fourteenth Amendment due process jurisprudence as setting forth the proper legal context in which to consider this claim. Indeed, this is the well-established legal context for considering incidents of forced medication such as the one alleged by plaintiff, and this court simply does not regard his assertions in this regard as giving rise to an ADA claim.

Plaintiff also asserts that he was not provided with proper treatment for his disability while in jail, but the weight of federal authority supports a position that failure to treat a disability may not constitute disability discrimination under the ADA. In *Doe v. Harris Cty., Texas*, for example, a Texas district court rejected allegations similar to those advanced by plaintiff here, writing that:

> Asserting that she is a person with a mental disability as defined by the ADA and that Harris County is a public entity within the meaning of Tile II of the ADA, plaintiff alleges that Harris County discriminated against her because of her disability in violation of the ADA by treating her as a criminal defendant who did not require mental health treatment or medical care, denying her reasonable and appropriate standards of hygiene, denying her services and programs that would have accommodated her disability and were available to other inmates, and threatening her with felony prosecution for behavior that was symptomatic of her deteriorating mental health.
> The court is not persuaded that these allegations state a claim under the ADA or § 504. Plaintiff's allegation that Harris County discriminated against her because of her

63

> disability by treating her as a criminal defendant who did not require mental health treatment, and by denying her services and programs that would have accommodated her disability are merely different ways of alleging that Harris County failed to provide her adequate mental health treatment.

2017 WL 4402590, at *29 (S.D. Tex. Sept. 29, 2017).  Other federal courts have reached similar results.  *See, e.g. Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010)( "The ADA prohibits discrimination because of disability, not inadequate treatment for disability."); *Kokinda v. Penn. Dep't of Corr.,* 663 Fed. Appx. 156, 159 (3rd Cir. 2016) ("the ADA prohibits disability-based discrimination, 'not inadequate treatment for the disability' "); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (in the absence of discrimination, the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners").

Plaintiff is able to point to *Borum v. Swisher Cty.,* No. 2:14-CV-127-J, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015) as an example of the minority of federal courts which have recognized an ADA or Rehabilitation Act (RA) claim based on allegations of inadequate medical treatment in jail.  Plaintiff cites no Fifth Circuit authority holding that such a cause of action is even a possibility, however, and he thus fails to establish a basis for his ADA inadequate treatment claim under binding precedent.

Even if this court were to assume that the Fifth Circuit would eventually find an ADA claim applicable in the state prison or jail context, it does not believe that discovery in this case revealed sufficient evidence to support such a claim.  In so concluding, this court notes that there was extensive evidence developed during discovery regarding the mental health treatment and medication provided to plaintiff, and medical records at the Clay County Jail indicated that his medical condition improved under this treatment.  For example, in his summary judgment brief, Dr. Miller wrote that:

On January 27, 2012, defendant Tanya West, R.N., who provided nursing services at the

Clay County jail, recorded in her notes that Harris had been refusing his oral medication and was exhibiting bizarre and violent behavior and threatening jail staff. As of that time, Harris had not taken any antipsychotic medication for at least several weeks. Consequently, in place of the prescribed daily oral medication that he was refusing to take, Harris was prescribed the antipsychotic drug Prolixin to be administered monthly by injection. Ms. West began administering Prolixin to Harris on or about February 8, 2012. In a statement written eight months later, Ms. West stated that Harris's mental state and behavior improved markedly after he began receiving the injections and that there had been no bizarre or violent behavior since the change to Prolixin. The jail medical records made by Ms. West show that Harris continued to receive anti-psychotic medication by injection until he left the jail pursuant to his commitment to East Mississippi State Hospital ("EMSH") in June 2016 and that Harris received the injections willingly, did not refuse any injections, and was not forcibly medicated.

[Miller brief at 3, record citations omitted].

There is thus significant evidence in the record that plaintiff did, in fact, receive medical treatment for his psychiatric illness while in the Clay County jail and that his condition improved as a result. This court notes that, in the face of such evidence, plaintiff's ADA briefing relies on proof which is less than persuasive. For example, plaintiff argues that:

Further, Harris was excluded from any and all participation in and/or denied the benefits of the services, programs, or activities of the MDMH, in which he was entitled to, per the Court's October 12, 2010 order which confirmed that Harris was "not competent to stand trial and ordered civil commitment proceedings to comply with Mississippi Code Annotated § 41-21-63 (1972)," all as a result of Harris' mental disability inhibiting his capacity to comprehend the nature of the proceedings, and demand that he receive the accommodations that other pretrial detainees deemed mentally incompetent received. There can be no doubt that the Clay County jail does not have the capacity to care for mentally incompetent persons, as otherwise there would be no need for a Court to order such a detainee to an institution under the direction of the MDMH for such specific accommodations. Therefore, due to Harris's lack of capacity to ensure that he be provided those accommodations afforded to him in an MDMH facility or a facility of his families choice, he was in fact denied the mental treatment he was entitled to, and that has been afforded to other persons in his position as a result of his incompetency.

[Plaintiff's brief at 46-47].

Thus, in support of the notion that he was provided with inadequate medical treatment at the Clay County Jail, plaintiff cites the Circuit Judge's October 12, 2010 order that he be civilly committed. Based on this order, plaintiff concludes that "[t]here can be no doubt that the Clay

County jail does not have the capacity to care for mentally incompetent persons, as otherwise there would be no need for a Court to order such a detainee to an institution under the direction of the MDMH for such specific accommodations." *Id.* This court regards this as rather underwhelming evidence that plaintiff was provided with medical care at the Clay County Jail which was so inadequate as to constitute an ADA violation, particularly since the order in question was made prior to the treatment in question. That being the case, this order cannot possibly serve as evidence of what kind of treatment plaintiff actually did receive in jail; at most, it could be regarded as evidence regarding one judge's expectation in this regard.

This court therefore concludes that, even assuming that the Fifth Circuit would recognize an ADA inadequate medical treatment claim in an appropriate prison case (which is far from clear), it would very likely require greater proof of an ADA violation than that which plaintiff has provided in this case. This court therefore does not regard the ADA as constituting the proper legal context in which to address any of plaintiff's allegations, and defendants' motion to dismiss this claim will therefore be granted.

This court notes that plaintiff has filed his own motion for partial summary judgment, but, inasmuch as it has previously concluded that all of his claims are either due to be dismissed or are the subject of triable fact issues, this motion must necessarily be denied. Moreover, while this court will thus permit some, but not all, of plaintiffs' claims against the county defendants to go before the jury, it must emphasize the trial in this matter will not involve the clear-cut case which plaintiffs seems to regard this as, but, rather, the highly complex and nuanced one which it actually is.

For example, while this court is certain that plaintiff would prefer for the jury not to learn that he was indicted for murder in this case, it believes this to be a fundamental fact of this case

which cannot reasonably be kept from it. Indeed, this court suspects that the nature of the crimes of which plaintiff is accused will be one of the, if not the, first things which the jury wishes to know about this case, and it will likely become suspicious of these proceedings if this basic and fundamental fact of this case is kept from it. Moreover, defendants' awareness of the charges facing plaintiff can reasonably be used by them as a defense to certain claims, including those seeking punitive damages and those alleging unlawful forced medication. At the same time, this court will not allow defendants to make excessive mention of the murder charges against plaintiff or to seek to inflame the jury with them. Consistent with this approach, this court will allow defendants to mention that plaintiff was indicted for murder in this case, but they will not be allowed to mention the specific details of the crimes for which plaintiff was indicted.

This court will give the jury appropriate instructions regarding the presumption of innocence, and defendants will not be permitted to argue that plaintiff is most likely guilty of murder or that he should simply be happy that he is not currently serving a life sentence for that crime. At the same time, this court will permit defendants to argue, in the punitive damages context, that they were concerned about protecting the public from an individual who was indicted for murder and that their actions should be judged accordingly. As noted previously, this court believes that this consideration did, in fact, motivate many of defendants' actions in this case, and it intends to allow both sides to make out their case, as long as they do not resort to inflammatory or provocative arguments.

Based on the foregoing, it is ordered that Allgood's motion for summary judgment is granted and the county defendants' motions for summary judgment are granted in part and denied in part. Plaintiff's motion for partial summary judgment is denied, and Allgood's motion to strike the expert testimony of Willie Abston [338-1] is dismissed as moot.

This, the 19th day of May, 2021.

/s/ Michael P. Mills
U.S. District Court